[Civ. No. 3390. Fourth Dist. Feb. 21, 1946.]

V. F. BENNETT, Petitioner, v. THE SUPERIOR COURT OF SAN DIEGO COUNTY et al., Respondents.

V. F. Bennett in pro. per. for Petitioner.

C. M. Monroe and Harry P. Sweet for Respondents.

MARKS, J.—This is an original proceeding in this court to review a portion of an order of the respondent court, which portion found petitioner guilty of contempt of court and fined him $250.

Petitioner is an attorney at law with a number of years' experience as a trial attorney and for much of that time has been the trial attorney in San Diego for the San Diego Electric Railway Company.

Evalyn Valentine brought an action in the Superior Court of San Diego County against the San Diego Electric Railway Company to recover damages for personal injuries alleged to have been suffered by her on March 1, 1944, when the bus on which she was a passenger for hire was brought to a rather sudden stop in an intersection to avoid hitting an automobile which entered the intersection without observing a boulevard

stop sign and passed through the intersection at a speed of 35 or 40 miles per hour, barely missing the bus by two feet or less.

The pleadings in the damage action are not before us nor is all of the evidence taken during the ten trial days, but the issues rather clearly appear from the portion of the record here. It was the contention of the plaintiff that the sudden stop threw her against parts of the bus causing very serious injuries. She testified that after the accident, when riding in an automobile, she sat on a pillow and had another at her back. It is evident that she maintained there were very serious injuries to her nervous system and body, principally to her back; that she was in constant pain; that she could neither enter nor alight from an automobile without assistance; that she could not stoop down, bend nor rotate her body; that she could not raise her arms above her head; that she was seriously and painfully disabled as a result of her injuries. It is clear from the evidence that Mrs. Evalyn Valentine exhibited signs of acute suffering in the court room; that she had difficulty in walking and while walking supported her body with her hand on her hip. About March 2, 1944, Mrs. Valentine was taken to a hospital operated by the county of San Diego, and was given thorough examinations. Her objective signs of injury were a bruise on the forehead, a bruise behind her left ear and a superficial bruise about five inches in diameter over the prominence of the left hip bone. X-rays showed an old separation of the acromioclavicular joint and an angulated coccyx. The examining physician was of the opinion that the shoulder injury and the angulation of the coccyx were old injuries and in no way connected with the accident. There was also a swelling in the left breast.

The theory of the San Diego Electric Railway Company is equally apparent from the record before us. It was that there was no accident on the bus; that Mrs. Valentine was not injured there; that she was malingering; that if she was suffering pain it was the result of a syphilitic infection which she then had; that if she was suffering that suffering was either deliberately or innocently overemphasized by the various physical examinations, her recounting of her supposed injuries, and the fact of the suit to recover damages.

To properly understand and appraise one of the findings in the order adjudging petitioner guilty of contempt of court

we must go outside of the typewritten record before us. After a writ of review was issued the members of this court held a conference with petitioner and counsel for respondent to determine what portions of the record should be transcribed as the return. It was agreed that the reporter's notes of the last three days of the trial should be transcribed. Later, on request of counsel for respondent, this record was augmented by a transcript of a small portion of the proceedings of the previous day. During this conference it was admitted that the question of the suffering of Mrs. Valentine from a syphilitic infection was first injected into the case by her attorney, Mr. Henderson, in his examination of prospective jurors.

On the last trial day the judge declared a mistrial on the ground of misconduct of the attorney for the San Diego Electric Railway Company, the petitioner here, and adjudged him guilty of contempt of court, imposing a fine of $250.

The formal order, omitting the title, is in words and figures as follows:

"BE IT REMEMBERED that on this 26th day of June, 1945, the above entitled action was proceeding in the 11th day of trial thereof upon the issues joined by the pleading, in the presence of the jury duly sworn and the Court, Robert B. Burch, Judge presiding, being the Superior Court of the State of California in and for the County of San Diego, in Department 3 thereof; James C. Henderson, Esq., appearing and present as attorney for plaintiff Evalyn Valentine, and V. F. Bennett, Esq., appearing and present as attorney for defendant San Diego Electric Railway Company.

"BE IT FURTHER REMEMBERED that the pleadings and issues joined were limited to the negligent operation of defendant's bus while plaintiff was a pay passenger thereon, the injuries suffered by plaintiff therefrom and the extent thereof while so riding as a passenger on defendant's bus and the contributory negligence, if any, of plaintiff passenger.

"BE IT FURTHER REMEMBERED that on the 9th, 10th and 11th days of said trial the Court believed that the conduct of said trial was being unduly delayed by conscious wilful and contumacious action upon the part of said V. F. Bennett, with a view to preventing the plaintiff from having a fair and just trial in said action upon the issues joined. Said conduct on the part of said V. F. Bennett is hereby particularized as follows;

"(1) Repeated and unwarranted reference to an unfortunate affliction suffered by the plaintiff in childhood many years ago, commonly known as syphilis, in a tone and manner calculated to reflect dishonor upon the plaintiff.

"(2) The inclusion in questions of matter repetitious, redundant, irrelevant and immaterial.

"(3) The constant and repeated interruptions of the answers of witnesses.

"(4) The argument of objections before and after the Court's ruling thereon.

"(5) The repetition of questions already asked and answered.

"(6) The interposition of objections and the indulgence in argument in bad faith.

"(7) Reference to a suit in the Small Claims Court to collect a bill owing by plaintiff, and the offer in evidence of the transcript of such proceedings, which had no bearing upon the issues, and reference to plaintiff picking up a sailor, which reference was in a manner and tone of voice to cast reflection upon plaintiff's motive and conduct in so doing, and by including in a long, wordy question, the insinuation of indecent exposure upon the part of the plaintiff, by removing her nightgown and assuming a position in the presence of witnesses in the parlor of her home.

"BE IT FURTHER REMEMBERED that as to each and all of these particulars the Court admonished the said V. F. Bennett of the impropriety thereof, and requested of the said V. F. Bennett that he proceed in the conduct of the trial by producing evidence material to the issues joined and refraining from the use of innuendoes and insinuations reflecting upon the character of the plaintiff, but that nonetheless, the said V. F. Bennett, though learned in the law and experienced in trial work, refused to abide by the Court's expressed rulings to the extent that the material evidence in the case was buried beneath the redundant, irrelevant and immaterial matter whereby a fair consideration of the material evidence was seriously interfered with, all of which facts the Court finds to be true.

"WHEREFORE, IT IS ORDERED, ADJUDGED AND DECREED that a mistrial be and it hereby is declared.

"IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the costs of suit, to date, be borne by the defendant and that

the plaintiff be given judgment against the defendant therefor.

"IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the said V. F. Bennett is guilty of contempt of Court and is fined the sum of $250.00 and granted 10 days within which to pay the fine.

"Done in open Court this 26th day of June, 1945.

"(Signed) ROBT. B. BURCH
Judge of the Superior Court."

One of the principal contentions of petitioner is that the foregoing order is fatally defective because it fails to recite "the facts as occurring in such immediate view and presence" of the court constituting such contemptuous conduct as required by section 1211 of the Code of Civil Procedure, but instead states merely conclusions which are not sufficient to support the order adjudging him guilty of contempt.

The rule relied on by petitioner is set forth in *Overend* v. *Superior Court,* 131 Cal. 280 [63 P. 372], as follows:

"In the case of a contempt committed in the presence of the court, the section says that the order adjudicating the contempt must contain a recital of the facts. This provision can only mean that the order must contain a recital of those facts which make out a case of contempt—that is, a recital of those facts which in a case of constructive contempt the law says must be incorporated in an affidavit.

"In *People* v. *Turner,* 1 Cal. 155, it is said: 'We think it follows, from the distinction above considered, that the final order of the court by which a party is adjudged to have been guilty of a contempt should always show, upon its face, the facts upon which the exercise of the power is based and the adjudication is made.'"

In support of this rule the following cases are cited in the opinion: *Ex parte Rowe,* 7 Cal. 181; *Batchelder* v. *Moore,* 42 Cal. 412; *Ex parte Zeehandelaar,* 71 Cal. 238 [12 P. 259]; and *Schwarz* v. *Superior Court,* 111 Cal. 106 [43 P. 580]. See, also, *In re Shortridge,* 5 Cal.App. 371 [90 P. 478]; *In re Lake,* 65 Cal.App. 420 [224 P. 126]; *Curran* v. *Superior Court,* 72 Cal.App. 258 [236 P. 975]; and *Wilde* v. *Superior Court,* 53 Cal.App.2d 168 [127 P.2d 560].

In reply respondent argues that the contempt consisted (1) in a course of conduct of petitioner during three trial days, and that it was unnecessary and impracticable to detail

all of the happenings of those three days in the order, and (2) that part of the acts of contempt consisted of the manner and tone of voice of petitioner which can only be described and not reproduced in the order. In support of these arguments he cites *Hallinan* v. *Superior Court,* 74 Cal.App. 420 [240 P. 788] ; *In re Grossman,* 109 Cal.App. 625 [293 P. 683] ; *In re Hallinan,* 126 Cal.App. 121 [14 P.2d 797] ; *Rose* v. *Superior Court,* 140 Cal.App. 418 [35 P.2d 605], and *Gillen* v. *Municipal Court,* 37 Cal.App.2d 428 [99 P.2d 555]. An inspection of those cases shows the orders there were much more detailed and complete in the descriptions of the conduct, tone of voice and manner of the various persons found guilty of contempt than in the order before us here.

In view of all the circumstances of this case we prefer to assume, without holding, that the order adjudging petitioner guilty of contempt, considered as a whole, sufficiently describes his actions and conduct and we will go to the record to determine whether or not it supports the judgment of contempt, though some of the specifications in the order are clearly defective in merely stating conclusions rather than facts.

Before going to the evidence, a few well established rules governing contempt of court should be outlined. In *Hotaling* v. *Superior Court,* 191 Cal. 501 [217 P. 73, 29 A.L.R. 127], a case involving constructive contempt, it was said:

"Contempt of court is a specific criminal offense. (*McClatchy* v. *Superior Court,* 119 Cal. 413 [39 L.R.A. 691, 51 P. 696] ; *Ex parte Gould,* 99 Cal. 360 [37 Am.St.Rep. 57, 21 L.R.A. 751, 33 P. 1112] ; *Ex parte Hollis,* 59 Cal. 408; *Reymert* v. *Smith,* 5 Cal.App. 380 [90 P. 470].) . . . The proceeding is of such a distinctly criminal nature that a mere preponderance of evidence is insufficient (*In re Buckley, supra,* [69 Cal. 1 (10 P. 69)] ), the defendant cannot be compelled to be sworn as a witness (*Ex parte Gould, supra*), and he cannot be convicted upon the uncorroborated testimony of an accomplice (*In re Buckley,* supra). . . .

"While the writ of *certiorari* is not a writ of error, it nevertheless extends to the whole of the record of the court below and even to the evidence itself where necessary to determine jurisdiction. (*Schwarz* v. *Superior Court, supra* [111 Cal. 106] ; *McClatchy* v. *Superior Court, supra; Great Western Power Co.* v. *Pillsbury,* 170 Cal. 180 [149 P. 35].) In reviewing this proceeding, the charge, the evidence, the findings, and

the judgment are all to be strictly construed in favor of the accused (*Schwarz* v. *Superior Court, supra*), and no intendments or presumptions can be indulged in aid of their sufficiency. (*Frowley* v. *Superior Court, supra* [158 Cal. 220 (110 P. 817)].) If the record of the proceedings, reviewed in the light of the foregoing rules, fails to show affirmatively upon its face the existence of all the necessary facts upon which jurisdiction depended, the order must be annulled. (*Frowley* v. *Superior Court, In re McCarty* [154 Cal. 534 (98 P. 540)], and other cases above cited.)''

In *Wilde* v. *Superior Court,* 53 Cal.App.2d 168 [127 P.2d 560], it was said:

''In cases of contempt committed in the presence of the court, the order adjudging the contempt must also recite facts which actually constitute contempt. It is also true that as the proceedings are of a criminal nature no presumptions may be indulged in favor of the judgment. These rules were clearly stated in *In re Lake, supra* [65 Cal.App. 420] : . . . 'There is the same unanimity of opinion supporting the rule that in cases of direct contempt the order of commitment is void ''unless it shows on its face acts sufficient to constitute a legal contempt. The order must contain a statement of facts equivalent to those which the law says must be incorporated in an affidavit for constructive contempt; and such facts must prove the contempt. Mere conclusions are not sufficient.'' (5 Cal.Jur. pp. 950, 951.)' ''

The foregoing rules are so well established in California that further citation of authorities should be unnecessary although there are many cases supporting them. Only three decisions of district courts of appeal are cited where it is intimated, but not directly held, that different rules might apply.

 The first specification in the order before us for review has to do with ''repeated and unwarranted'' reference to a syphilitic infection ''suffered by plaintiff in childhood many years ago'' and the manner and tone of voice in which such references were made.

A careful check of the record before us shows that petitioner asked five questions about syphilis or tabes dorsalis, two of the jurors each asked one question about syphilis, and Mr. Henderson, the attorney for plaintiff, asked five questions about syphilis or its treatment or tabes dorsalis, and the trial court asked one question in the answer to which

syphilis was mentioned. The partial record of the hearing on the day previous to the three days mentioned in the order shows that after objection was made to a question put by petitioner to Dr. Louis Strahlmann, which question had nothing to do with the disease, the following occurred:

"THE COURT: The difficulty is you (Mr. Bennett) keep hammering out on one point all the time and it gives the jury a bias and prejudice and disqualifies them more or. less to consider all the evidence. If by any chance the doctor has anything to tell us that he hasn't told us, he may do so. THE WITNESS: The conclusion from the second examination and inspection of the hospital records and X-rays indicated that the previous conclusion as to injury was correct; that in addition to that the patient had had a syphilitic infection and that it was quite probable that the headache and the varying complaints to a large extent were due to the previous syphilitic infection, probably with involvement of the brain and spinal cord."

We have 248 pages of reporter's transcript of the three days of trial which show that petitioner's five references to syphilis, or tabes dorsalis, and the answers to his questions on those subjects, compose a very small fraction of the whole. For us to hold that these five references were so repetitious as to be contemptuous would seem to us to be entirely unjustified.

The next question is—were those references "unwarranted" as found by the trial judge? The answer to this question seems obvious as illustrated by the answer of Dr. Strahlmann, already quoted.

As we have already observed the plaintiff claimed to have been suffering serious disabilities during the trial and her actions indicated she was in great pain. It was one of the theories of the San Diego Electric Railway Company that if plaintiff was actually disabled and was actually suffering pain it was not because of any injuries suffered while a passenger in the bus but because of a syphilitic infection overemphasized by the circumstances of the trial. There is considerable evidence in the record supporting this theory.

█ Pain and suffering are elements of damage if they result from injuries for which a defendant is responsible. If they result from other causes they are not proper elements of damage. █ Here the question of the cause of plaintiff's suffering bore directly on the amount of damages to be

awarded her, if any. The question of her "unfortunate affliction," to adopt the language of the trial judge, was an important element in the question of damages and their amount so it cannot be said that petitioner's five references to that affliction were "unwarranted." Instead, those references were on a material issue pertinent to the issues before the court and jury.

The balance of the first specification that the reference "to the unfortunate affliction suffered by plaintiff in childhood many years ago, commonly known as syphilis," is misleading to say the least and, if taken literally, is not only not supported by, but is contrary to the record.

In none of his questions did Mr. Bennett refer to an early syphilitic infection *many years ago* but to one found to exist during the month of March, 1944, the month plaintiff claimed to have been injured while a passenger on the bus. There were five hospital records before the trial court which are not before us. There is evidence indicating that at least two of these records had to do with tests made on the plaintiff for syphilis. A Wassermann test was made on March 26, 1944, with a positive reaction, probably plus four. A Kahn and Kolmer test was made on March 27, 1944, with a negative reaction. A physician of long experience testified that it is possible for the Kahn and Kolmer test to be negative and the Wassermann test to be positive when the patient is suffering from syphilis in the tertiary degree. This same physician examined the plaintiff on three separate occasions and formed the opinion that she was malingering and was not suffering severe pain either from the accident, if any, or as a result of syphilis.

We will reserve, until later in this opinion, comment on the finding as to the tone of voice and manner of petitioner contained in the first specification as similar matters are set forth in the seventh specification.

The fifth specification of the order may be considered with the second as both refer to repetitious questions and the repetition of questions already asked and answered. The second also pertains to questions on redundant, irrevelant and immaterial matters. If the trial court had included in the order that Mr. Bennett had asked compound and complex questions it would have found more support in the record than the finding that his questions were repetitious.

The first example of any impatience on the part of the

trial judge with Mr. Bennett for repeating questions was during the examination of Dr. Andrews, a witness for the defendant, where the following occurred:

"THE WITNESS: To the extent that she is worried and perplexed about the final outcome of this issue, that is the great shadow upon her mind. If there had never been any question of this sort she should long ago have been past any idea of disability. Let me say here that disabilities due to organic causes do not come and go rapidly, as this patient before me walked in a more lame condition than you have seen her walk here and before the end of my examination was walking with perfect freedom and going through movements. If that interference was due to damage, organic damage to nerve structures, it would be fixed for a time. It would not be subject to these rapid changes. Only emotional interference explains those rapid changes. BY MR. BENNETT: Q. Doctor, just state what, in your opinion, is the situation as to whether or not the hope of gain in connection with the outcome of this action has anything to do with these symptoms that we have of her at one time, as you have described, walking worse than we have seen her walk here and then shortly walking upright and without any of those signs? A. Yes—— MR. HENDERSON: We object—— May I have my objection, doctor, please? We ask that the answer be stricken. We object to that as being asked and covered. THE COURT: The objection will be sustained and after deliberation only I will decide not to punish counsel for having intentionally asked it, in the teeth of the direct ruling of the Court upon the same question yesterday afternoon. BY MR. BENNETT: Q. Doctor, in your opinion, is this woman malingering or not? A. To some degree malingering. Q. Are you able to give us any idea as to the degree, basing it upon your observations and examinations of her? A. Due to the effect upon her emotional instability and the controversy now before the court. MR. BENNETT: Cross examine."

The question to which objection was sustained on the previous day occurred during the examination of Dr. F. G. Lindemulder, a witness for defendant. The supplemental reporter's transcript shows the following:

"BY MR. HENDERSON: Q. And in all honesty on her part she might unconsciously, because of all of those other matters and her case being discussed and talked over and around, unconsciously limp more than she would if we did

not have all of those factors present? Isn't that true? A. Yes. Q. That is quite common, that when one has to come before a group and discuss injuries and have all their case gone over, that the power of suggestion reaches the point where perhaps a person does over-emphasize their particular disability in that regard and that they are not faking in that regard? Isn't that right? A. Yes. Mr. Henderson: That is all.

### Further Re-Direct Examination.

"By Mr. Bennett: Q. What would be the accentuating or motivating factor in connection with over-emphasis that you say might be occasioned by either the trips to examining doctors and taking depositions in connection with a law suit where they are seeking to recover $25,000.00 for alleged injuries? What would be the motivating factor, Doctor? Mr. Henderson: Object to that as assuming something not in evidence. The Court: Well, it is inconsistent with the doctor's answer perhaps to the last question to assume that it is done with a motive. The doctor has no suggestion that it was done with a motive, or not, in accordance with the last answer given. It might be or it might not be. I will sustain the objection."

The ground on which the trial court sustained the objection should be particularly observed, namely, that the question called for information inconsistent with the previous answer. There is nothing in the testimony of Dr. Andrews inconsistent with the answer apparently expected by petitioner when he asked the question already quoted. Thus the reasons given by the trial judge when he sustained the objection on the previous day would furnish no grounds for belief that it would be regarded as contemptuous to propound a somewhat similar question to Dr. Andrews.

However, it is not necessary to lengthen this opinion with further consideration of these questions. The contempt found in these specifications consists in certain questions put by petitioner. These questions are not set forth in the order but only the conclusion of the trial judge that the questions were repetitious, redundant, irrelevant, immaterial and had been asked and answered. These conclusions are not sufficient to support an order of contempt as the facts, that is the questions regarded as contemptuous, should have been set forth in the order. (§ 1211, Code Civ. Proc.; *Ex parte*

*Rowe, supra; Overend* v. *Superior Court, supra; In re Battelle,* 207 Cal. 227 [277 P. 725, 65 A.L.R. 1497] ; *In re Zuker,* 13 Cal.App.2d 427 [56 P.2d 1261].) This is true not only because of the statutory requirement but because the proceeding is criminal in nature with no presumption in favor of the adjudication and all the presumptions in favor of the accused.

What we have just said applies with equal force to the third specification which refers to "repeated interruptions of the answers of witnesses." In this connection we will add that we have searched the record and have found surprisingly few, if any, instances where petitioner interrupted the answers of any witness. It is significant that at no time during the three days of the trial in question here did the trial judge call Mr. Bennett's attention to the interruption of a witness when answering a question. His counsel have failed to point out any such occurrences in their brief. This specification is not supported by the record.

The fourth specification relates to "the argument of objections before and after the Court's ruling thereon." We had always supposed that it was a counsel's privilege, if not his duty, to argue an objection before the trial judge ruled on it (*Platnauer* v. *Superior Court,* 32 Cal.App. 463 [163 P. 237]) unless requested or instructed not to do so by the court, which was not done here. In fact, petitioner courteously obeyed all admonitions of the court and did very little arguing on objections before a ruling was had, which rulings in several instances were unnecessarily caustic and were made in the presence of the jury. To illustrate, we quote from the direct examination of the witness William H. Huntley, as follows:

"Q. Can you give us the approximate date of that trial? A. Well, I got it on the books; not right offhand I couldn't. We had so much of that work I don't know. I couldn't exactly give you the date. I don't know without looking at the books. The Court: This type of evidence should not be introduced, Mr. Bennett. It is calculated to prejudice the jury. It cannot be of any other value. Mr. Bennett: That is, you mean the evidence of the witness, your Honor? The Court: If you don't know what I mean I will put you some place where you will have time to think it over and discover. Mr. Bennett: All right, your Honor."

The only argument of any moment on questions, after the

trial court had ruled on objections, occurred on the afternoon of Friday, June 22, 1945, and the morning of the following Monday during the cross-examination of Mrs. Valentine, the plaintiff. To understand the situation we must briefly outline the circumstances leading up to it.

The plaintiff, Mrs. Evalyn Valentine, and Marion Valentine of Los Angeles, first met about August 30, 1944. The acquaintance seemingly was sought by Marion. Just who she was and her relationship with the case was not developed before the trial judge declared a mistrial, though from the questions asked of Evalyn it would be assumed that Marion was an investigator employed by the San Diego Electric Railway Company.

During this cross-examination Evalyn Valentine proved herself a difficult witness with a very faulty memory. First she denied being with Marion Valentine except on a very few occasions. Upon being pressed by petitioner, and her memory refreshed with the times, places and incidents, she admitted being with Marion Valentine on several occasions. Particularly, she first denied going to the home of a Mr. and Mrs. Hanlon in the Marion Valentine automobile, obtaining a lawn mower there, taking it to her home for sharpening and returning it to the Hanlon home. Subsequently she corrected her testimony after having talked with her ''secretary,'' a neighbor who lived across the street, and she then admitted the trip for the lawn mower. She denied that she had lifted the heavy end of the mower into the Marion Valentine automobile or had carried that end when it was placed in the automobile for the return trip to the Hanlon home.

Mr. Bennett attempted to lay the foundation for impeachment of Mrs. Evalyn Valentine by seeking to establish the times, places, parties present, during the happening of these various events as well as circumstances surrounding each one. Some of his questions were long and involved and objections were properly sustained to them on the ground that they were complex.

Mr. Bennett seemed to be of the mistaken but honest opinion that it was necessary to lay the same foundation in cross-examination of the plaintiff to be able to prove acts and circumstances contradicting her testimony, that is necessary to establish prior to the impeachment of a witness by former contradictory statements. This is not the law. (27 Cal.Jur., p. 149, § 123.) However, there is nothing to indi-

cate that Mr. Bennett was not sincere in his mistaken construction of the law. ██ We know of no rule of law permitting a court to punish an attorney because he is honestly mistaken in his interpretation of the law when he presents his mistaken views to the court in a proper and respectful manner. As said in *Ex parte Lake, supra*: "It never has been held that in the trial of an issuable fact an attorney is guilty of contempt in merely offering insufficient, or even incompetent, evidence in an effort to prove that fact."

██ As we have observed, this occurred on Friday afternoon, June 22, 1945. Mr. Bennett did not unduly argue with the court after objections to his questions had been sustained and as far as the record discloses his attitude toward the court was courteous. The following is a fair example of what occurred on that afternoon:

"By Mr. Bennett:

"Q. On this same day, did you not, with the assistance of Marion Valentine, pick up a lawnmower that was at the Hanlon property and take it to your home, for your husband to sharpen the lawnmower? Mr. Henderson: Objected to as argumentative. The Court: Sustained. Mr. Bennett: I am attempting, your Honor, to lay the foundation for impeachment, and it is my understanding that this is the correct procedure. I don't want to ask these questions notwithstanding your Honor's ruling. The Court: Well, you see, you fix a date when she says she wasn't there at all and you do not fix a date that she was there, and I sustain the objections on those grounds. Mr. Bennett: My understanding of the rule is that you have to specify the time and the place in question. The Court: All right. You certainly have specified the time and place many, many times this afternoon in the last ten minutes; many, many times. By Mr. Bennett: Q. Did you not on this same occasion pick up the heavy end of the lawnmower and put it into Marion Valentine's car, with her assistance? The Court: Well, I will sustain it. You can ask her if she did not at that house, though. The Witness: What was your question, your Honor? The Court: I haven't asked any question, Mrs. Valentine. Counsel is giving you the question. Mr. Bennett: I didn't hear your Honor's remarks. The Court: I say there is no occasion in the question. Now, you can ask her if she picked up a lawnmower and walked around the yard at any time. By Mr. Bennett: Q. Did you at any

time subsequent to March 1st, 1944, pick up a lawnmower at the Hanlon residence and put it into Marion Valentine's automobile? A. I did not. I wasn't there with her. I don't see how I could put it in there. Anyway, I don't even mow the lawn or touch the lawn at my home. I don't see how I could do it at some neighbor's house. Q. And did you not when you got to your home assist in lifting and taking this lawnmower out of Marion Valentine's automobile? MR. HENDERSON: Objected to as argumentative and incompetent, irrelevant and immaterial. THE WITNESS: Your Honor, I said it didn't happen. THE COURT: Well, I think it is. It assumes that she went there, in the face of her testimony that she did not, and therefore that phase of the question certainly must be objectionable, and in her testimony she has had it frequently called to her attention whether she went there on that day with Mrs. Valentine and she has frequently said no. So there can be no inadvertence about that. Therefore, it is argumentative. You are arguing that she did go there, and did do certain things. MR. BENNETT: Well, Your Honor, please, it is near our adjournment time and may we adjourn now and may I discuss this matter with your Honor? THE COURT: I will adjourn now and let the jury off until Monday morning, with the admonition not to discuss the issues of the case."

After the jury was excused the trial judge and Mr. Bennett discussed the law and the trial procedure. The trial judge explained his reasons for sustaining objections, which reasons were sound. Mr. Bennett asked leave to present authorities on the question and the judge remarked: "Get me some law on it and if I am wrong I will change the situation." The time taken by this portion of the record was almost entirely consumed by the remarks of the trial judge with very brief and courteous replies from Mr. Bennett.

On Monday morning the following occurred: "THE COURT: Have you a little law to present to the Court, Mr. Bennett? MR. BENNETT: Yes, I have something that I think will be helpful. THE COURT: What is this on? MR. BENNETT: This is in reference to the cross-examination of the witness with reference to impeaching questions. (Argument by Mr. Bennett.) (Argument by Mr. Henderson.)"

This is the only occasion on which there was any extended argument by either counsel after the trial judge had ruled on objections. As this argument was had with the

express consent, if not on the invitation of the court, it can furnish no ground for holding petitioner guilty of contempt of court.

Mrs. Evalyn Valentine was recalled for further cross-examination on the afternoon of Monday, June 25th. She changed and corrected her testimony and admitted being various places with Marion Valentine which she had denied on previous occasions, including the trip for the lawn mower. Mr. Bennett then proceeded to cross-examine her as to her actions on these occasions, such as getting into and out of an automobile unassisted, running, walking up and down steps, lifting weights and carrying them, including the lifting of the heavy end of the lawn mower into and out of Marion Valentine's car, taking dishes and other objects from high shelves and replacing them, all of which tended to contradict her testimony as to her physical disabilities and were very material on the issue of the extent of her injuries, if any. While some of Mr. Bennett's questions were compound and therefore objectionable, that does not seem to have been the ground of the trial judge's rulings towards the close of that day, as shown by the following: "Q. Did you not on that day go there and after having gotten out of the automobile, standing on the curb, stoop over and pick up an empty whiskey bottle which was lying in front of the tire of the Marion Valentine automobile and remove it from the front of the automobile? MR. HENDERSON: Objected as immaterial. She probably should have left it there. MR. BENNETT: We object to the remarks of counsel. THE COURT: I think that all of this is immaterial. I don't think that the witness can remember a lot of things you have written down, which some spotter has observed. I don't believe that is laying the foundation for impeachment. I will sustain the objection to the general line of questioning." There are other comments, made in the presence of the jury, on the weight of evidence and credibility of witnesses without any cautionary warning. (Const., art. VI, § 19.) We find nothing in the record to sustain the specifications in the order that Mr. Bennett had improperly argued objections before or after the trial court had ruled on them or had interposed objections and indulged in argument in bad faith.

■ The sixth specification relates to "the interposition of objections and the indulgence in argument in bad faith." Clearly this is not a sufficient recitation of fact to sustain the

judgment of contempt. Further, we have searched the record and have found nothing in it to sustain this conclusion of the trial judge. His counsel have failed to cite us to any portion of the record supporting this conclusion. Attorneys and sometimes judges are mistaken in their interpretation of the law without being accused of contempt of court. There is nothing to indicate bad faith on the part of Mr. Bennett in making his objections and in arguing them. To reach any such a conclusion we would have to violate one of the fundamental rules in proceedings of this kind and indulge in presumptions against Mr. Bennett instead of presuming him innocent of wrong.

Before proceeding to the consideration of the seventh specification we should quote the final proceedings on the last day of the trial which were as follows:

"By Mr. Bennett: Q. Did you not on this same day get in the automobile after cashing the check and ride with Marion Valentine to La Jolla, and did you not suggest to Marion Valentine that you pick up a sailor at the Destroyer Base and after he got in the machine did you not turn around and twist around in the front seat and talk with the sailor until he was left out at Market and Pacific? Mr. Henderson: Object to it as immaterial, argumentative and complex. Mr. Bennett: It has to do, if your Honor please, with the ability to bend her back. Mr. Henderson: May we present this matter without argument? Mr. Bennett: Well, you have been arguing. Has there been a ruling Mr. Reporter? The Court: Not yet. Do you recall, Mr. Bennett, the Court's ruling on the transcript of the Small Claims Court? Mr. Bennett: The what, your Honor? The Court: The offer of the transcript of the Small Claims Court. Mr. Bennett: Yes, your Honor, I do. The Court: Do you recall my ruling about the nudity of the plaintiff and the nightgown episode in the front room of her home and the Court's ruling on that? Mr. Bennett: No, I do not, your Honor. The Court: Now, we have the sailor episode. Now, what are the purposes, Mr. Bennett, of these several offers? Mr. Bennett: I don't understand your Honor's last remark. The Court: Read it to him. (Record read.) Mr. Bennett: Well, I will take the first one, about getting down on her knees and reaching under the bed to pull out the "jeep" toy and so forth. The Court: You are out of order. Read

counsel my remarks. (Record read.) THE COURT: What was your purpose in offering in evidence the transcript of the proceedings to collect the bill for the furniture? What was your purpose of including in your question the narration about the indecent conduct of the plaintiff in respect to her nightgown, and now again in respect to a sailor that she picked up? Will you answer me that? MR. BENNETT: I will, your Honor. The one with reference to the proceedings was to fix the date of the proceedings, if your Honor please, and the one with reference to the nightgown was to show her ability to pull her nightgown up over her head, to show the free and unrestricted use of her arms and of the muscles of her back, and the one with reference to the sailor, if your Honor please, was to show her ability to turn around in her seat and talk with a person in the back; in other words, to show the freedom with which she could use the muscles of her back without restriction and without pain, to twist and turn freely without the pain that she claims that she has here, your Honor. Those are the purposes I had in mind. THE COURT: I doubt it. I am very sorry, indeed. I believe that the greatest institution in the world is the jury trial. I believe that it contemplates that citizens of the county where the litigants live shall come and hear the evidence and determine the truth and the just rights of free men. I believe that in the conduct of this trial, after the Court has repeatedly endeavored to make known to counsel the Court's dissatisfaction with the manner in which the character of the plaintiff has been attacked, that the possibility of a fair trial, in my mind, and hence I must conclude in the minds of the jury, is impossible, gone, destroyed, by a failure to appreciate the importance of a fair and just trial. Under the circumstances I feel it necessary to declare a mistrial and assess the costs upon the defendant and fine counsel for his conduct in the sum of $250.''

The seventh specification divides itself into three parts: (1) The small claims court case; (2) ''Picking up a sailor,'' and (3) the nightgown episode.

The small claims court specification refers to an offer in evidence of a certified copy of a proceeding in that court during the examination of William H. Huntley, a witness for the San Diego Electric Railway Company. This witness and his brother, George A. Huntley, were in business together as upholsterers. William interviewed Evalyn Valentine about

May 1st, 1944, in reference to reupholstering some of her furniture. The two brothers called for the furniture a few days later and delivered it in about 10 days. They described her actions and manner of walking as normal. William saw her a few days later walking normally with her husband. George testified that he saw her in the small claims court in National City; that "on the 19th of June she was summoned into court to pay the bill that she refused to pay"; that "when the decision was rendered against her she walked up to the judge and paid the judge the money at the time"; that she got out of an automobile without help and walked without limping. This evidence was received without objection. William corroborated the testimony of his brother except that he did not know the date of the hearing in the small claims court. Mr. Bennett offered in evidence a certified copy of the proceedings in that court for the purpose, as he said, of fixing the date of the hearing.

■ The offer of the record was improper as it should have been shown the witness to refresh his memory and nothing more. The trial judge properly excluded this incompetent evidence. However, the offer could not have been prejudicial to the plaintiff as the fact of the hearing and the judgment against the plaintiff had been detailed by George A. Huntley without objection, and those facts were known to the jury. As we have already seen, the offer of incompetent evidence bearing on an issuable fact has never been considered of itself ground for holding an attorney guilty of contempt of court. (*Ex parte Lake, supra.*)

■ It is true that Mr. Bennett asked Evalyn Valentine if on a certain date while riding with Marion Valentine on Pacific Highway in San Diego, she had not suggested they "pick up" a sailor. The facts would seem to be that Pacific Highway is a very busy thoroughfare which runs by the Destroyer Base and crosses Broadway. This "pick up" happened in the daytime and there were two women in the automobile.

■ Following mobilization after December 7, 1941, all of us were urged to "give service men a lift" as a patriotic duty. Patriotic organizations built stations bearing such signs where service men could assemble. There are many of these in San Diego County and elsewhere. This is common knowledge of which we can, and the trial court should have taken judicial notice. ■ It is also common knowledge that a great many people use the expression "picked up"

when speaking of giving a service man a ride without intending to imply an improper motive. The expression was used generally and innocently by a great many people.

But, argue counsel for respondent, the words "pick up" have another meaning and are used to describe the accosting of a person of one sex by a person of the other as a preliminary to an assignation. This is true but the circumstances should be considered, if necessary, to determine the meaning Mr. Bennett intended to convey in using these words in his question. There were two women in the car. It was broad daylight on a busy street of an overcrowded city. The sailor only rode from the Destroyer Base to the foot of Market, a principal street of San Diego. It would be very strange, indeed, if one of the two women should accost a sailor under those circumstances with improper motives. We do not believe that we, as presumably reasonable human beings, should put any such far-fetched meaning on the expression under the circumstances appearing here.

We have already seen that in reviewing a proceeding of this kind the evidence, the findings, and the judgment are to be strictly construed in favor of the accused and that no intendments or presumptions can be indulged against him. (*Hotaling* v. *Superior Court, supra.*) There is also what has been characterized as one of the strongest presumptions "that a person is innocent of crime or wrong." (Code Civ. Proc., § 1963, subd. 1.) This presumption is with us here and should have been invoked in favor of petitioner in the trial court. (*Wilde* v. *Superior Court, supra.*) Therefore we must conclude, and the trial judge should have concluded, that the expression "pick up" was used in the sense of defining the customary and praiseworthy act of giving a service man a lift and did not reflect on the character of Evalyn Valentine.

The nightgown incident occurred at the home of Evalyn Valentine when Marion Valentine called upon her. Marion was met at the door by Evalyn who was dressed in her nightgown. The question implies that Evalyn, in the presence of Marion and no one else, and in the privacy of her own home, pulled her nightgown over her head and proceeded to dress herself. This evidence was admissible to show the use of her arms and back muscles in contradiction of her other testimony. To twist these acts into an accusation of indecent exposure would be to violate the rules of law last referred to. We would also have to impute to Mr. Ben-

nett the intention of placing upon an act innocent in itself a farfetched meaning that his question does not imply.

We must now return to that portion of specification one relating to the tone of voice and manner in which petitioner referred to the disease from which plaintiff was suffering and the portion of specification seven relating to his tone of voice and manner when referring to picking up the sailor. As we have already seen, the evidence evidently sought to be elicited was very material to an important issue in the case. It is significant that not once during the taking of testimony concerning the disease did the trial judge admonish Mr. Bennett about his tone of voice or manner, nor did counsel for plaintiff mention those subjects. There was nothing in the questions asked by Mr. Bennett to reflect on the plaintiff other than the fact that she was suffering from the disease which evidently she had admitted and which was a material subject of inquiry in the case. We have already described the "pick up" incident. The language used by petitioner in either instance was not offensive nor did it violate any rules of law known to us except that some of his questions were complex.

In this connection we deem the following language used in *Curran* v. *Superior Court,* 72 Cal.App. 258 [236 P. 975], appropriate and applicable here:

"The second finding, namely, that the remarks addressed by the petitioner to the court were spoken in a loud, combative, and contentious tone of voice, and that such loud expressions and intonations were disorderly, contemptuous and insulting to the court, can refer only to the statements heretofore shown in the order and taken down by the shorthand reporter at the time. As the court said in the case of· *Platnauer* v. *Superior Court, supra* (32 C.A. 463), page 475 [163 P. 242]: 'If in discharging his duty he (counsel) happens to be persistent or vehement or both in the presentation of his points, he is nevertheless within his legitimate rights as an attorney so long as his language is not offensive or in contravention of the common rules of decorum and propriety.' While the courts in other jurisdictions have held that the tone of voice and attitude of counsel in making on proper occasions proper statements to the court may constitute contempt, yet we are reluctant to extend the rule farther than was done in the Platnauer and Shortridge cases, *supra,* and hold that the occasion and the language being proper the

intonations of the voice, the vehemence of the objections or the physical attitude of counsel in making them, would alone support the conclusion of the judge that such behavior was disorderly, contemptuous, or insolent toward the court and tended to interrupt the due course of the trial, and thus subject the offender to a judgment of fine and imprisonment. The relations between court and counsel may and often do during the course of a trial become strained; mutual conditions of irritation may be created in the heat of debate, leading to tones and demeanor which in other situations would clearly manifest contempt but which, under the conditions often existing in a hotly contested criminal case, such as is indicated by the record here, should lead to no such conclusion. Much must be pardoned under the circumstances to the infirmities of human nature, and as much excused by the liberty of speech if in the heat of a trial the expressions of counsel are not always coldly precise, or his tones unmarked by excitement or even anger.''

We are of the opinion that the record before us does not disclose acts or conduct on the part of petitioner showing him guilty of contempt of court. Therefore, in finding him guilty the trial judge exceeded his jurisdiction and the order is void.

The portion of the order adjudging petitioner guilty of contempt of court and fining him $250 is annulled.

Barnard, P. J., and Griffin, J., concurred.