[Civ. No. 4444.   Fourth Dist.   Jan. 29, 1952.]

GEORGE CHULA, Petitioner, v. THE SUPERIOR COURT OF ORANGE COUNTY et al., Respondents.

Head, Jacobs & Corfman, Robert Jacobs, Otto A. Jacobs, Winthrop O. Gordon, Mize, Kroese, Larch & Mize, Wm. H. Cree, R. C. Mize, Marjorie Mize, Delbert L. Larch, Ira Kroese,

Robert B. Webb, Jack J. Rimel, James C. Monroe, John W. Solomon and Joseph A. Ball for Petitioner.

Joel E. Ogle, County Counsel, George F. Holden, Stephen K. Tamura and Robert J. Switzer, Deputy County Counsel, for Respondents.

GRIFFIN, J.—Petitioner, an attorney at law, was cited for contempt in the above entitled court for certain alleged contemptuous acts committed in the presence of the trial judge, who sentenced petitioner to five days in the county jail. By this writ petitioner seeks to annul the order of contempt.

Counsel for the respective parties stipulated in open court in response to the order to show cause here issued, that the return herein filed by respondent may be considered as a "rejoinder" and it was agreed that the entire matter may be submitted to the court for decision on its merits.

A reviewing court may, in such a proceeding, examine the allegations of contemptuous acts alleged to determine if they do in fact constitute contemptuous acts sufficient to give the court jurisdiction to punish petitioner for contempt, and the review may extend to the whole of the record of the court below where it is necessary to determine the jurisdictional fact. (*Hotaling* v. *Superior Court,* 191 Cal. 501, 506 [217 P. 73, 29 A.L.R. 127]; *Bennett* v. *Superior Court,* 73 Cal.App.2d 203, 210 [166 P.2d 318].)

A proceeding to punish a defendant for contempt is in its nature a criminal proceeding, and the charge and finding thereon, and the judgment of the court, are to be strictly construed in favor of the accused. (*Schwarz* v. *Superior Court,* 111 Cal. 106 [43 P. 580].)

Here the action of the trial judge grew out of the trial of Henry Ford McCracken, who was charged with murder, kidnapping, and child stealing, in Orange County. Petitioner, a young attorney of limited trial experience, was appointed by the court to defend the defendant. After a protracted jury trial of many weeks, attracting much publicity, a jury returned a verdict of guilty of child stealing, not guilty of kidnapping, and disagreed on the charge of murder. Immediately thereafter, a trial was had on the charge of murder, which trial consumed a considerable amount of time and resulted in a verdict of guilty of that charge. Thereafter his plea of not guilty by reason of insanity was heard. The jury found defendant sane at the time of the commission of the

offense. The several trials involved days of testimony and no doubt the parties concerned were tired, in a high state of anxiety, and desirous of an early determination of the issues presented.

It appears that during the sanity hearing a Dr. Musfelt was called as one of the court's appointed psychiatrists. He testified, in substance, about the medical examination he made of the defendant and concluded that in his opinion the defendant was sane at the time of the commission of the alleged offense. Petitioner, as counsel for defendant, cross-examined this witness and consumed about 112 pages of transcript in so doing. A small portion of that cross-examination bore upon the subject of "schizophrenia." After terminating this cross-examination, on the following day, petitioner, who had made some further study of the subject, asked permission of the court to recall the witness for further examination. The request was granted and the following examination was had:

"By Mr. Chula: Q. Dr. Musfelt, I called you back because I would like to ask you a few questions, a few more questions on schizophrenia and what it is, and certain facts about it.

"Now, is schizophrenia an organic disease, in other words, I mean, would you explain what we mean by organic disease?

"Mr. Kneeland: Your Honor, I object to that, the matter has already been gone into on direct examination.

"The Court: Objection sustained.

"Mr. Chula: If your Honor please, we are calling this witness as our own at this time. We had him on cross-examination as the Court's witness previously, and we haven't gone into this; that is, it may have been gone into very lightly. As a matter of fact, I hadn't read about the matter up to that time.

"The Court: The objection will be sustained.

"Mr. Chula: Q. Is schizophrenia a mental disorder which is a various, is a composite of various personality conflicts, in other words, the cause of that type rather than of a disease such as a scar on the brain or something?

"Mr. Kneeland: I object to that question as leading and suggestive, improper direct examination.

"The Court: Objection sustained.

"Mr. Chula: If your Honor please, I would like the record to show that the defense doesn't have any money to call their own witnesses or hire anybody to——

"The Court: Just a moment, Mr. Chula, you can take those matters up outside the hearing of the jury at the Judge's bench.

"Mr. Chula: And I would like the record also to show, your Honor, the reason that we have approached the bench here, it was for the same reason, we have approached the bench for the same purpose, and the reason we have approached the bench at these various times is because of the order of the Court on these subjects and not to hide anything from the jury.

"May we approach the bench?

"The Court: Yes.

(The following proceedings took place at the judge's bench, outside the presence and hearing of the jury:)

"Mr. Chula: If your Honor please, as I understand the Code, the Court has a right to call those witnesses as their own, the prosecution has a right to call them as their own, and when any one of the sides to the action, or the Court, call a witness, the other parties have a right to cross-examination.

"The last time the doctor was on the stand we cross-examined him as to a small part of schizophrenia. As to those matters that we have questioned him about, I still feel that we have a right on direct examination to take over this witness as our own at this time and the prosecution can cross-examine him if they wish.

"The Court: Nobody is arguing with you because the objection was that the question was leading and suggestive. If you see fit to call him as your own witness, that's all right, but no cross-examination as you started to do right there.

"Mr. Chula: And, further, in this particular case the rule is, if I understand it correctly, and I have been incorrect and I probably am about many matters, it is not that I am going against the rules of the Court, but the rule, as I understand it, is that leading and suggestive questions may be used on certain types of witnesses under certain conditions, at the discretion of the Court, and that they should be in this case, inasmuch as the defense hasn't had ample opportunity to go over this with this witness, we have had no opportunity to talk with him privately; that he is a Court-appointed witness, that we should be able to use reasonable leading questions

with him, we just can't start in saying, 'Tell us what we talked about yesterday', we have got to give him leading and suggestive questions and ask him about various phases of it, and we should be allowed to lead this witness, since the defendant doesn't have any money for their own experts. . . .

"MR. CHULA: Q. Would you tell us, what is the general characteristic of schizophrenia?

"WITNESS: A. There is no one general character——

"MR. KNEELAND: Just a minute, Doctor, I will object to that question. I think the matter was gone into fully with Dr. Musfelt the other day.

"THE COURT: Objection sustained. . . .

"MR. CHULA: Q. Isn't the concept of schizophrenia one that is really not too concrete?

"MR. KNEELAND: Object to that, your Honor, as leading.

"THE COURT: Objection sustained.

"MR. CHULA: Q. That concept of schizophrenia, that the concept of schizophrenia in the past years originally evolved by Kraepelin and then by Meyer later, and Bleuler, have all been various, they have defined it in various ways, and they have meant different things when they have said schizophrenia, isn't that correct?

"MR. KNEELAND: Your Honor, I object to that as leading and cite the conduct of defense counsel as prejudicial in view of the previous rulings of the court.

"THE COURT: The objection will be sustained. In view of the ruling of the Court, Counsel, I would suggest, Counsel, that you govern yourselves by that ruling. You have your recourse if I am in error, and you are not to persist in the face of a ruling.

"MR. CHULA: Is it my understanding, then, your Honor, that the ruling means I am not to ask any questions on schizophrenia at the present time of this witness?

"THE COURT: Nothing of the kind.

"MR. CHULA: What, sir?

"THE COURT: Nothing of the kind.

"MR. CHULA: Q. If a person has schizophrenia, Doctor, it won't show up in any organic test, will it, or will it?

"MR. KNEELAND: I object to that as leading, your Honor.

"THE COURT: Objection sustained.

"MR. CHULA: Q. Well, a person who has schizophrenia, if a person has schizophrenia, will it show up organically?

"MR. KNEELAND: I object to that, your Honor, as leading and improper direct examination at this time. . . .

"THE COURT: The objection will be overruled.

"MR. CHULA: Q. What do we mean by organic, you know, when we say, can you tell whether there was any organic cause?"

(Then followed a lengthy dissertation by the witness on the subject.)

"Q. Is schizophrenia a result of, say possibly only one confliction in the emotions, or is is a composite?

"MR. KNEELAND: I object to that, your Honor, as leading.

"THE COURT: Objection sustained.

"MR. CHULA: Q. Doctor, have I ever, for the record, your Honor, have I ever discussed this, talked this matter over with you as to these questions and answers?

"MR. KNEELAND: Object to that, your Honor, as incompetent, irrelevant and immaterial.

"THE COURT: Sustained.

"MR. CHULA: May I make an offer of proof, your Honor?

"THE COURT: Surely.

(The following proceedings took place at the judge's bench, outside the presence and hearing of the jury:)

"MR. CHULA: If your Honor please, I would like to, we could by this witness, by that question, prove that leading questions are necessary in this witness, as stated before, since this witness hasn't talked privately with us except from the standpoint of where I called the doctor on the phone and said, 'Will you come over to court tomorrow, I want to ask you some questions about schizophrenia,' nothing else other than that, and that we haven't had any discussion with him about the matter, and that leading and suggestive, leading questions, especially, I don't know about suggestive, are necessary for proper examination of this witness.

"THE COURT: Let the record show that the doctor underwent solid cross-examination by the defense on this subject for 112 pages which covered this exact ground, and I can see no occasion for going into it any further.

(The following proceedings took place in open court, within the presence and hearing of the jury.)

"MR. CHULA: Q. Doctor, if we took an encephalogram test on a person who had schizophrenia, would that show up on the test?

"MR. KNEELAND: I object to that, your Honor, as leading and suggestive.

"THE COURT: Overruled.

"WITNESS: A. You mean an electroencephalogram like they do, that you would get——

"Q. That is correct. A. It isn't likely it would show anything.

"Q. And can you tell us whether schizophrenia is a rare mental disease, psychosis, or is it a frequent one? A. Very common.

"Q. And can you tell us in percentages about how many people in the public hospitals and the mental hospitals have schizophrenia?

"MR. KNEELAND: Your Honor, I object to that as incompetent, irrelevant and immaterial.

"THE COURT: Objection sustained. I believe you testified to that the other day, did you not, Doctor?

"WITNESS: All about it.

"THE COURT: And you testified to the question before that, in my recollection. I believe that both of those have been gone into.

"MR. CHULA: I didn't remember that.

"THE COURT: I have just told you.

"MR. CHULA: Q. With a person who has schizophrenia, Doctor, will they show or have epileptiform or syncopal attacks which suggest seizures of epilepsy?

"MR. KNEELAND: I object to that, your Honor, as leading, improper direct examination.

"THE COURT: Overruled.

"WITNESS: A. They may or they may not; I will have to qualify that. I can't say yes or no, some do, some don't. . . .

"Q. Now a person who has schizophrenia, how does that affect their mental capacity?

"MR. KNEELAND: I object to that, your Honor, as having been gone into and having been asked and answered.

"THE COURT: Objection sustained.

"MR. CHULA: Asked and answered on the cross examination, is that what you mean?

"THE COURT: Several times.

"MR. CHULA. Q. The transition from schizoid type, just a plain schizoid, to the schizophrenic, is that a rapid transition, or is it one that slowly but surely, from the schizoid we fade into the schizophrenic?

"MR. KNEELAND: I object to that as leading and suggestive.

"THE COURT: Objection sustained."

Thereafter, similar questions were propounded and answered without objections. Objections were sustained to many of them and overruled as to others. The jury was then excused. The trial judge and counsel retired to the court's chambers and the court remarked:

"THE COURT: In the face of rulings by the Court for the last 12 minutes counsel for the Defendant has had open in front of him at the counsel table a book which I presume is his book on psychiatry, from which he has been obviously reading, asking leading questions and suggestive questions in the face of such rulings which have been made prior to that time. That I consider a direct disobedience of a lawful order made by the Court. It is willful, and intentional and I cite it as such and the matter will be disposed of at a later time.

"Do you have something else to take up at this time?

"MR. CHULA: May I be advised as to what order I was in contradiction to and I would like the record also to show this book which I had was laying on the table in front of me among other papers. No mention was made of the book itself. As a matter of fact reference was also made interminglingly with other papers in front of me and that further I may be dumb about this whole thing and stupid and ignorant, but I can see of no other way to protect this Defendant's rights other than to ask the questions or the Appellate Court or no one else will know what I was going to ask the witness; that I asked the Court whether the ruling he gave would go to all of the questioning on schizophrenia and that statement was that it did not, and that therefore I had no other way of knowing, I honestly had no other way of knowing that until I asked the question, and in all fairness to the defense counsel in this matter and to the court—I know that our nerves are frayed and mine are and the Court's are and everyone concerned—that such tendencies in the outlook on such a matter as contempt have succeeded in my mind especially on many points of failing to act as I thought best for the defense of this Defendant from the standpoint of fear of the Court in the matter that the action of the Court and inferences therefrom with the impending results we must anticipate and the censure upon this counsel that will come from any citing of contempt, which is apparent from this statement are such that —and I am working on this case for nothing. It gives me the feeling that I have nothing to gain and everything to lose from the standpoint of reputation and otherwise, and that as far as this Defendant is concerned I can't really see why my

life should be ruined trying to defend a man to the best of my ability under such circumstances, and the same have hastened my action in the insanity trial and the actions of the Court against counsel have been such that I have become hesitant of doing much of anything in the defense of this man.

"Every time I have been fearful of every consequence because every time I have opened up my mouth I have had threat or inference of contempt before me.

"THE COURT: The only time you need to worry about contempt is when you commit contempt.

"MR. CHULA: And prior to this time on the contempt I have had no warning, as I recall it, that I should not ask questions of this type as to each question. You said it was leading and the objection was overruled. I was not told not to ask any more questions on schizophrenia. I did ask other questions to the best of my ability; that there was no direct intentional disobedience of the Court order.

"THE COURT: You deny that there was any direct intentional disobedience of the Court order?

"MR. CHULA: That is right."

This is a fair exemplar of the proceedings leading up to the order of contempt, which we will designate as charge No. 1. Predicated upon this showing, the court found that petitioner willfully, deliberately and with complete disregard of the rulings of the court, asked the witness leading questions and sought to cross-examine him for the purpose of placing before the jury the subject matter excluded; that such actions tended to interrupt the due course of the trial and impair the respect of the authority of the court.

The next charge (designated as No. 2) is that petitioner made disrespectful remarks to the judge in chambers, in this, that petitioner was endeavoring to explain to the court why he was compelled to examine the medical witness produced by the court to prove his defense. He said:

"MR. CHULA: I would like to state this in my own defense; at that time you must realize, and I think the record will show, that we had been through a trying eight weeks and we had thought the relatives would be able to raise money for psychiatrists, *and in addition to that we have felt since then that possibly our only hope lies in an appeal.*" (Emphasis added.)

"THE COURT: For that reason you want to get all the errors in the record possible.

"Mr. Chula: The point is this—*we feel there is enough in the record already*—but the point is this, that we felt that merely by going into this matter and putting ourselves out financially, individually—we are attempting at this time to get this thing over with as fast as possible." (Emphasis added.)

"The Court: That is what I am trying to do.

"Mr. Chula: Further, Your Honor, I would like to state an objection to the statement of your Honor—personally I get along with you, I hope—but this is a matter of legalities, that the statement made by the judge, being in the presence of the press and if the same is so printed, is a prejudicial error on the part of the Judge in this case, and I so cite the same.

"The Court: All right, that is the end of it."

Another incident is cited (which we designate as Charge No. 3) as occurring at the bench when petitioner assigned a statement of the judge as prejudicial error and remarked: "I don't know what number it is," (the number of the assigned errors up to that time.)

In another charge (No. 4) respondent claims contempt in the following demeanor:

"Mr. Chula: May I approach the bench?

"The Court: Surely.

"Mr. Davis: May I finish the question?

"The Court: I don't know what we are approaching the bench for.

(The following took place at the Court's bench outside the hearing of the jury.)

"Mr. Chula: *You know very well what I am approaching the bench for.*" (Emphasis added.)

"The Court: Are you talking to me when you say that?

"Mr. Chula: No—Mr. Davis."

These constitute the major acts claimed to be contemptuous. As to the latter's claim (No. 4) a mere recitation of the dialogue between the parties clearly shows that Mr. Davis may have made the remark instead of the trial judge, or at least the petitioner believed that the remark was made by the prosecuting attorney and not by the court at that time, and so indicated by his answer to the court's question. Apparently the court was satisfied of the fact that petitioner thought that the prosecuting attorney made the remark at the time. The judge did not assign such remark as contemptuous and did not warn petitioner nor rebuke him for making such a remark. He admits in his statement that he

did not remember this conversation until he discovered it in reading over the record after the trial was completed.

In *Gallagher* v. *Municipal Court*, 31 Cal.2d 784, at 797 [192 P.2d 905], the court stated:

"The heat of the courtroom debate, particularly where liberty is concerned, often gives rise to persistence on the part of counsel. If the words used by counsel are respectful and pertinent to the matter before the court, it is not unnecessarily burdensome to require the judge first to warn the attorney that his tone and facial expressions are offensive and tend to interrupt the due course of the proceeding. Otherwise, attorneys could be subjected to fines and jail sentences because of personal annoyance and pique on the part of trial judges; and these penalties could be rendered unassailable, as is contended here, by lengthy recitals in the orders of contempt respecting the demeanor of the contemner."

No wilful contemptuous conduct thus appears.

As to charge No. 3, the record shows that petitioner did, on other occasions, cite statements of the judge as prejudicial error, and apparently was endeavoring to list the number of such assigned statements in sequence. Petitioner claims that he thought the court was keeping track of the assigned errors by number. Likewise, it also here appears that the judge did not assign this statement as contemptuous at the time, nor did he "warn" nor "rebuke" petitioner for such claimed misconduct. It does not appear that this claim is deserving of particular consideration.

As to charge No. 2, it appears that the statement was made by petitioner in the court's chambers, in which he clearly demonstrated to us that all parties had been through a "trying eight weeks"; that the court felt as though petitioner was merely endeavoring to have it commit some prejudicial error in the trial of the action by its rulings, and the court accused petitioner of such conduct. The petitioner endeavored to explain his actions and probably did unkindly remark: "We feel there is enough in the record already." Petitioner claimed that on the trial of the "not guilty" plea, the court had already committed what petitioner believed were prejudicial errors, and that he did in this manner inform the court of that fact. These remarks rather indicate that both counsel and the trial judge were rather tired and were, to some extent, wearing upon the nerves of each other. Stand-

ing alone, it does not appear that this remark would justify the judgment of contempt and the punishment inflicted.

As to charge No. 1, a more serious problem is presented. There is confusion in the record as to whether petitioner recalled the witness for further cross-examination or whether he recalled him for the purpose of making him his own witness. The record shows that the witness was under cross-examination when dismissed. The following day petitioner asked permission of the court to recall the witness for *further examination*. He stated:

"Dr. . . . I called you back because I would like to ask you a few questions, a few more questions on schizophrenia and what it is, and certain facts about it."

■ The court sustained an objection to a proper question then propounded on cross-examination, on the ground that the "matter has already been gone into on *direct* examination." The ruling on the named ground was clearly erroneous because the court-appointed witness had testified on direct examination and was then on cross-examination on the subject. The petitioner, to avoid the erroneous ruling, apparently offered to make the witness his own witness and the court thereafter "sustained" an objection to it. The petitioner then approached the bench, as heretofore indicated, and correctly explained to the court that since the witness was a court-appointed witness and had been examined by the court, the defendant should have had a right to cross-examine the witness on the subject matter. Apparently foreclosed of this right, petitioner then maintained a right to call the witness as his own witness for the purpose of bringing out certain testimony, and the court stated that if petitioner saw fit to make the witness his own he could do so, but it would allow no cross-examination. Thereafter, objections to several questions were sustained as leading, until the petitioner propounded the following question: "Well, a person who has schizophrenia, if a person has schizophrenia, will it show up organically?" The court overruled an objection to this question, as "leading" and as "improper direct examination," and thereafter considerable testimony was admitted bearing on the subject. The judge then again sustained objections to a series of similar questions on the subject, on the ground that they were leading, and overruled others. It should be noted that after many such rulings were sustained on the ground that the questions were leading, petitioner inquired of the court: "Is it my understanding,

then, Your Honor, that the ruling means I am not to ask any questions on schizophrenia at the present time of this witness? THE COURT: Nothing of the kind. MR. CHULA: What, sir? THE COURT: Nothing of the kind.'' Petitioner then proceeded as indicated.

As heretofore stated, the petitioner, being young and inexperienced in the trial of criminal cases, was appointed originally by the court to defend the defendant. The record indicates that petitioner did, on several occasions, ask the permission of the court to withdraw as such attorney, which request was denied. It does appear that he did prosecute the first trial with some degree of success. The trial judge immediately ordered a retrial of the remaining charges at a time when public opinion was aroused and all parties were in a somewhat nervous state of mind. In the trial of the insanity action no doubt the petitioner felt a keen responsibility rested upon him in his efforts towards his client. Apparently the defendant was without funds to employ medical experts in his own behalf and petitioner was endeavoring to make use of the testimony of the medical witnesses appointed by the court for the purpose of establishing defendant's claimed defense of insanity. We see no valid reason why counsel for the defendant should not have taken advantage of this privilege because, as indicated by petitioner in presenting his reasons for further examination of the medical witness, he pointed out that under section 1027 of the Penal Code it is the duty of the alienist appointed by the court to examine the defendant and investigate his sanity and to testify in any proceeding in which the sanity of the defendant is in question. He may be called by either party to the action or by the court itself. When called by the court or by either party to the action, the court may examine the alienist and either party may cross-examine him in the order directed by the court. When called by either party to the action the adverse party may examine him the same as in the case of any other witness called by such party.

In People v. Hickman, 204 Cal. 470 [268 P. 909, 270 P. 1117], it was held that a person charged with a crime is presumed to be sane until the contrary is established by a preponderance of the evidence, and it was stated that where insanity is introduced as a defense, to prove it by a preponderance of the evidence does not affect the other rule that the burden of proving sanity is on the prosecution, and that the rule relating to the defense of insanity does not shift the

burden of proof from the People to the defendant but only shifts the *burden of introducing evidence* and declares the amount or quantum of evidence which he must produce to overcome the presumption and show his insanity. It therefore appears that a broad latitude should be allowed counsel for defendant under the circumstances in meeting the burden imposed upon him by law. It does appear that petitioner was somewhat persistent in his endeavors to establish by the witness certain medical testimony, and in doing so he did ask repetitious questions bearing on this subject. ▇ Hypothetical questions directed to an expert witness are not necessarily leading questions. In *Dees* v. *Louisiana Oil Refining Corp.,* (La.App.) 162 So. 597, 600, the court said: ''Leading questions are always permissible when experts are being interrogated as witnesses.'' ▇ The general rule appears to be that stated in *Galveston, H. & S. A. Ry. Co.* v. *Powers,* 101 S.W. 250, 254, where it is said:

''. . . it is ordinarily permissible to ask an expert witness a leading question when his opinion is sought upon a matter about which, by reason of his professional knowledge and skill, he has peculiar information.''

See, also, *People* v. *Wheeler,* 60 Cal. 581 [44 Am.Rep. 70]; *Rose* v. *National Lead Co.,* (Mo.App.) 94 S.W.2d 1047; *Alaska United Gold Min. Co.* v. *Keating,* 116 F. 561 [53 C.C.A. 655]; *Estate of Melvin,* 85 Cal.App. 691 [259 P. 980]; 32 C.J.S. 344, § 550, note 23; *State* v. *Allemand,* 153 La. 741 [96 So. 552]; *Sanguinett* v. *May Dept. Stores Co.,* 228 Mo.App. 1161 [65 S.W.2d 162]; *Strever* v. *Woodard,* 160 Iowa 332 [141 N.W. 931, 46 L.R.A. N.S. 644]; *Edwards* v. *Burke,* 36 Wash. 107 [78 P. 610]; 22 C.J. p. 705, § 794, footnote 14(a). There are, however, a few cases, based upon the questions there presented, which we have discovered that might indicate a contrary holding. See *Missouri, K. & T. Ry. Co. of Texas* v. *Johnson,* (Tex.Civ.App.) 193 S.W. 728; 22 C.J. 710, § 798, and cases cited.

Respondent points out that it was immaterial whether the court's ruling was or was not correct; that it was nevertheless petitioner's duty to abide the ruling of the court and not persist in propounding leading questions, citing Penal Code, section 1044, and *Fisher* v. *Pace,* 336 U.S. 155 [69 S.Ct. 425, 93 L.Ed. 569].

This general statement may be true. ▇ However, where the trial court makes an erroneous ruling as to the admissibility of a certain line of evidence, counsel for defendant

should be given much latitude in pressing his point and in convincing the court of the error, at the time it is made. The correctness of the ruling may bear upon the question whether such persistence in pressing petitioner's claimed right is solely in the interest of his client's defense or whether his actions constitute wilful disobedience of a ruling, particularly where petitioner inquired of the court, if by its ruling it meant that petitioner should not pursue the subject of schizophrenia any more, and the court remarked: "Nothing of the kind." ▮▮▮ When an expert witness has testified that in his opinion a defendant was sane at a particular time, considerable latitude should be allowed counsel for the defendant to cross-examine the witness so testifying on the subject matter. (32 C.J.S. 369, § 560.)

It does appear, from the 112 pages of testimony pertaining to the cross-examination of this doctor, that very few pages were devoted to the subject of schizophrenia. From a reading of the questions as propounded, to which questions the court sustained objections on the ground that they were fully covered by a previous cross-examination, it is difficult to determine from the record whether they were in fact fully covered. It is true that the court did allow the witness to answer many of the questions propounded by petitioner on this subject and clearly indicated that it did not intend to preclude the petitioner from propounding questions about schizophrenia. The court did not permit the witness to answer the questions, mainly on the ground that the questions were leading.

▮▮▮ As pointed out by respondent, defense counsel, however zealous in his client's behalf, has, as an officer of the court, a paramount obligation to the due and orderly administration of justice, and at all times should maintain a respectful attitude toward the court. ▮▮▮ A disavowal of intentional disrespect or wrongful intent is no defense to a contempt order. (*Daily* v. *Superior Court,* 4 Cal.App.2d 127 [40 P.2d 936].)

It is true that an attorney cannot always be right and may be wholly wrong in his position upon the legal question under argument, and to the mind of the court so plainly wrong that the latter may conceive that it requires no enlightenment from the argument of counsel. ▮▮▮ But, whether right or wrong, he has the right to an opportunity to present his theory of the case on any occasion where the exigency of the pending point in his judgment requires or

justifies it. (*Platnauer* v. *Superior Court*, 32 Cal.App. 463, 475 [163 P. 237] ; *Bennett* v. *Superior Court*, 99 Cal.App.2d 585, 595 [222 P.2d 276].) ▉ An attorney has the duty to protect the interests of his client. ▉ He has a right to propound a legitimate argument and to protest an erroneous ruling, and there is no rule permitting a court to punish an attorney because he is honestly mistaken in his interpretation of the law when he presents his mistaken views to the court in a proper and respectful manner.

In *Gallagher* v. *Municipal Court*, 31 Cal.2d 784 [192 P.2d 905], the court cited with approval *Platnauer* v. *Superior Court, supra,* and stated, at page 788:

"But certainly a mere mistaken act by counsel cannot render him in contempt of court. Even if a legal proposition is untenable, counsel may properly urge it in good faith; he may do so even though he may not expect to be successful, provided of course, that he does not resort to deceit or to *wilful* obstruction of the orderly processes." (Italics ours.)

In *Caldwell* v. *United States*, 28 F.2d 684, the court held that punishment of an attorney, as for contempt, for repetition in different form of a question to which objection had been sustained, was unwarranted; and that since there was no showing that there was any *wilful* attempt to evade the court's ruling, it pointed out that "unless a ruling is amplified by an explanation of the reasons therefor, attorneys, especially in the course of rapid cross-examination, often put a question in different form, as a matter of caution, and with no desire to evade the ruling of the court, or to be contumacious," and said:

"Thus suddenly to punish for conduct of doubtful propriety only, where the intent to be insubordinate is not clear, might very well have the result of deterring an attorney of less courage and experience from doing his full duty to his client."

See, also, *Sprinkle* v. *Davis*, 111 F.2d 925 [128 A.L.R. 1101], where it is said:

"Even if it be conceded that the offered evidence was inadmissible, counsel were nevertheless entitled to offer it in good faith, free from threat of punishment by the court. Actions taken by counsel during the course of trial under a mistaken view of the law do not constitute contempt of court; and a careful examination of the record convinces us that there was no such perseverence by defendant's counsel in a mistaken point of view contrary to the rulings of the

court as to constitute improper conduct on their part." (And, also, *In re Lake,* 65 Cal.App. 420 [224 P. 126].)

In the instant case the record would not sustain a finding that anything petitioner said or did was boisterous, noisy, offensive, or threatening in any manner. In the contempt proceedings had before the trial judge, he so stated. In that statement he based his order mainly upon the claim that his ruling was that the questions propounded were leading and suggestive; that since petitioner had recalled the witness as his own witness, and so informed the court, and since petitioner thereafter proceeded to cross-examine him after the court admonished petitioner not to do so on several occasions, he violated the court's ruling in pursuing such conduct.

We have examined the entire record presented pertaining to these proceedings and fail to find therefrom, contrary to the trial judge's finding, that the acts complained of show that petitioner did "willfully," "deliberately," and "with complete disregard and in flagrant violation of" the admonitions of the court, ask leading questions for the purpose of placing before the jury improper matter, and that such actions were so contumacious as to justify the order or the penalty inflicted.

Accordingly, the order adjudging petitioner guilty of contempt of court and imposing sentence thereon is annulled.

Barnard, P. J., and Mussell, J., concurred.