[Crim. No. 17371. Fourth Dist., Div. Three. Feb. 28, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
SANDRA KAY FATONE, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

---

*Certified for publication except as to parts II and VI-VIII (Cal. Rules of Court, rules 976 (b) and 976.1).

COUNSEL

Jaffe & Jaffe and F. Filmore Jaffe for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steven H. Zeigen and Edward J. Mantyla, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

CROSBY, J.—Sandra Kay Fatone was convicted of attempted murder with use of a firearm and assault with a deadly weapon (Pen. Code, §§ 664/187, 12022.5, and 245, subd. (a)). We must reverse because the cumulative impact of the trial court's consistent and unjustified abuse of defense counsel before the jury, combined with a number of mistaken legal rulings, deprived the defendant of the basic right to a fair and impartial trial.

I

Sandra and Jerry William Fatone were married in 1963 and are the parents of two sons who are now teenagers. The marriage was a stormy one; and, according to Sandra, Jerry often physically abused her and the children. Several times she was hospitalized for mental problems and finally began proceedings to obtain a dissolution in 1974. The final judgment was entered in 1976, with custody of the children awarded to Sandra.

The dissolution was not the end of the less than ideal relationship between the parents, however; it primarily served as the introduction to a new series of bouts, in and out of court. For example, they wrangled over a home inherited by Sandra and her sons from her mother. Jerry, acting in his capacity as trustee for the boys' interest in the property, allegedly attempted to forcibly evict her by cutting off the electricity and plumbing. She in turn threatened to kill Jerry on several occasions. Sandra was also involved in a physical altercation with Jerry's new wife on Halloween, 1976, when the latter put a gun to her head, according to Sandra; and "I waited for her to kill me." Sandra embarked on another round of mental commitments after the dissolution, and Jerry ultimately obtained custody of the children.

On October 9, 1980, Sandra bought a .25 caliber automatic pistol, although she did not return to pick it up until weeks later. She testified she bought it for self defense because she was a single woman living alone. The jury was permitted to hear she lied on the required firearms record form by denying she had ever been confined to a mental institution.

The incident which led to Sandra's arrest and prosecution occurred on November 20, 1980. There were but two witnesses, Sandra and Jerry Fatone. At approximately 2:30 p.m., Sandra went to Jerry's house in Los Alamitos to pick up her sons for a prearranged visit.

When he told her at the front door the boys were not home yet, Jerry testified she produced a pistol from her purse, aimed at him, and pulled the trigger. He heard a click, but no shot was fired. She then attempted to chamber (or rechamber) a round, but he slammed and bolted the door and immediately called the sheriff's department.

In Sandra's version of the encounter, Jerry was standing in his yard when she arrived in an automobile containing most of her personal possessions. Living in a motel at the time, she did not like to leave her belongings in the room during the day. He approached the vehicle, and she partially rolled down the window. Without provocation he threatened her in the following words: "You better have plenty of protection when you come around here." Replying, "I do," she turned to the back seat, obtained a box, removed the lid, and displayed a gun—without touching it. She then placed the box under the seat. She testified she realized she had made a mistake almost immediately.

Jerry said the boys were not home and walked off in the direction of the house. She approached the door and knocked, but there was no answer. After conversing briefly with a neighbor, she reentered her automobile and started to drive away. Jerry reappeared, however, and she asked when the boys would return. He replied in half an hour or so. She said she would come back then and drove to a nearby shopping center where she ate an ice cream cone and passed the time. When she returned, Jerry met her at the front door and said the boys were not home yet.

Sandra appeared for a third time about 7:30 p.m. Jerry called the sheriff's department again, while his wife stalled her on the porch. Two patrol units arrived shortly; and Sandra drove away, crossing over a yard and sidewalk to prevent them from blocking her car. A high speed chase involving some 10 other police vehicles then ensued over a distance of approximately 15 miles. Sandra drove at speeds up to ninety miles an hour, ran traffic signals, forced one police car off the road, and finally stopped in front of the Long Beach Police Department, where her automobile was rammed by one of the pursuers. She was tackled by an officer as she ran up the steps of the department and violently resisted several officers' efforts to subdue her. Sandra, who was diagnosed as a paranoid schizophrenic by the defense doctors,

testified she was afraid of the Orange County officers and drove to her hometown police department in order to show her "custody papers."

Her pistol, with a bullet in the chamber and two in the magazine, none of which displayed evidence of having been struck by the firing pin, was found on the floorboard on the driver's side of her vehicle. Two boxes of cartridges were located in her purse. The weapon was later discharged three times by a prosecution expert without misfiring.

In the trial of this emotionally charged credibility contest between former spouses, each side produced potent testimony to attack the veracity of the other: The prosecution was permitted to present evidence of Sandra's flight from Jerry's residence in exquisite and probably excessive detail, but the defense was not allowed to elicit the opinion of a superior court commissioner that Jerry lied under oath in three of the rancorous Fatone domestic proceedings.

## II*

. . . . . . . . . . . . . . . . . . . . .

## III

 Although it is judicial misconduct for a judge to display bias against the defense case or in favor of the prosecution during voir dire (*People* v. *Jackson* (1955) 44 Cal.2d 511 [282 P.2d 898]) and although it is error for a judge to disparage psychiatrists before the jury when the defense intends to offer psychiatric testimony (*People* v. *Mahoney* (1927) 201 Cal. 618 [258 P. 607]), the first contention is easily dismissed. We have been supplied no transcript of the voir dire of the jury. The Attorney General chivalrously concedes the trial prosecutor admits the court made a derogatory statement concerning psychiatrists during voir dire, but based on the prosecutor's recollection, argues it is quoted out of context and would not be viewed as harmful to the defense in that light.

Defense counsel has yet to request an augmentation of the record to correct the defect, a tacit acknowledgement of the accuracy of the Attorney General's response. Since the judgment must be reversed in any event and the incident is, hopefully, unlikely to recur, there is no reason to direct augmentation of the record on our own motion (see Cal. Rules of Court, rule 12(a)).

---

*See footnote, *ante,* at page 1164.

## IV

██ By far the most troubling aspect of this appeal is the issue presented concerning the trial court's treatment of defense counsel before the jury. Sandra's brief points to but two instances of abuse; however, our perusal of the record has revealed they are not isolated slips in a lengthy trial, but part of a pattern of which there are numerous examples. The most serious incidents occurred during cross-examination of Deputy Dennis Sulka of the Orange County Sheriff's Department.

Sulka was the officer who took the initial crime report from Jerry Fatone at about 2:30 p.m. on November 20. He was apparently called in order to buttress the latter's testimony by describing his emotional state ("very nervous and . . . hyper"). But the prosecutor received an unforeseeable windfall when defense counsel, for reasons best known to himself, failed to lodge a hearsay objection and, in the following words, specifically invited Fatone's previous consistent statement to the officer (see Evid. Code, § 791): "I'm going to object to this as leading and suggestive. He can ask what the conversation was, let him testify, and I'll have no objection. His testimony as to what Fatone told him." Defense counsel also failed to object to the relation of a conversation the officer had with Fatone's neighbor; the prosecutor's direct examination with that witness proceeded as follows:

"Q. Now, did you also have a conversation with a David Landrum across the street, sir?

"A. I believe it was directly next door.

"Q. And how long did that conversation last?

"A. Perhaps three to five minutes only.

"Q. Was any additional information, as to what had happened in the house, given to you by that conversation?

"A. I asked if he had seen the suspect, or what had happened, and he just described the woman, the same suspect description, had walked up to him and asked him some conversation about the boys."

The fireworks started on cross-examination. The first problem arose when defense counsel attempted to question Sulka concerning the Landrum conversation:

"Q. You spoke to David Landrum, did you, the neighbor?

"A. Yes, I did.

"Mr. Feccia [the deputy district attorney]: Objection, hearsay[!]

"The court: Sustained.

"Mr. Jaffe [defense counsel]: Well, if your honor pleases, counsel asked about a conversation he had with Mr. Landrum.

"The court: I thought you objected and we struck it.

"Mr. Jaffe: No, I did not.

"The court: It's still hearsay.

"Mr. Jaffe: I have another right—he opened the door—I have a right to find out what that conversation was.

"The court: You can ask the officer in private, then, sometime if you're really interested.

"Mr. Jaffe: I think the jury should be interested in it, your honor, because it goes to the mental state of Mrs. Fatone and her appearance at that time.

"Mr. Feccia: We will be calling Mr. Landrum. I suggest we wait for him.

"The court: Sure. Sustained.

"Q. Did Mr. Fatone tell you that his wife had a case of mental illness?

"Mr. Feccia: Irrelevant, hearsay[!]

"The court: Sustained.

"Mr. Jaffe: Your honor, I can't understand, respectfully, how you can ask him a question about what he told him about what he—

"The court: Just follow the court's guidance. When I sustain an objection, that means you don't ask any further questions about that issue."

There was absolutely no basis for the rulings on the prosecutor's objections. He himself had elicited the hearsay statements the cross-examination related to, and they were received in evidence without objection. Hearsay

is admissible in the absence of an objection, and a defendant is obviously entitled to cross-examine on evidence the prosecution elects to offer. We need look no further than the Sixth Amendment of the United States Constitution for that elementary proposition: "In all criminal prosecutions, the accused shall enjoy the right to . . . be confronted with the witnesses against him . . . ." (See, e.g., *Chambers* v. *Mississippi* (1973) 410 U.S. 284 [35 L.Ed.2d 297, 93 S.Ct. 1038], *Smith* v. *Illinois* (1968) 390 U.S. 129 [19 L.Ed.2d 956, 88 S.Ct. 748], *Pointer* v. *Texas* (1965) 380 U.S. 400 [13 L.Ed.2d 923, 85 S.Ct. 1065], and *Douglas* v. *Alabama* (1965) 380 U.S. 415 [13 L.Ed.2d 934, 85 S.Ct. 1074]); see also Cal. Const., art. I, § 15, *People* v. *Gutierrez* (1982) 137 Cal.App.3d 542 [187 Cal.Rptr. 130], and *Chula* v. *Superior Court* (1952) 109 Cal.App.2d 24, 36 [240 P.2d 398].)

The judge not only erred in restricting the cross-examination, the belittling suggestion that counsel should interrogate the officer privately if he "really" was interested in whether Jerry told him of Sandra's history of mental illness improperly implied the question was insincere and groundless. The record justifies neither implication.

We also find the humiliating elementary school scolding administered at the end of the colloquy wholly unwarranted. Counsel's patience was undoubtedly exhausted by the series of incorrect and unfair rulings to which he had been subjected, and his protestations were advanced in a reasonable and respectful manner: "where the trial court makes an erroneous ruling as to the admissibility of a certain line of evidence, counsel for defendant should be given much latitude in pressing his point and in convincing the court of the error, at the time it is made." (*Chula* v. *Superior Court, supra,* 109 Cal.App.2d at pp. 38-39.) These incidents were just the prelude, however. The worst was yet to come, only two questions later.

Defense counsel asked, "Did you have a conversation with a deputy sheriff by the name of Lester Fatone of the Lakewood Sheriff's station?" This prompted an immediate request for a bench conference by the prosecutor, which was granted. Defense counsel was asked for an offer of proof and explained, "All I want to know is, if he [Jerry Fatone] has a brother by the name of Lester Fatone, who was a deputy sheriff in Los Angeles, and if he [Deputy Sulka] had a conversation [with him] about this event." This seemingly reasonable explanation prompted a request for sanctions from the prosecutor and the following from the judge: "It's clear it's improper, Mr. Jaffe . . . . Because you have no expectation that there's going to be any comments . . . . The sanctions, of course, are for contempt. And the court is loathe to consider such a sanction because it's obvious that counsel, in good faith, attempted to defend his client, and has only pursued

this avenue because of ineptitude and inexperience; after all, only 30 years as a practitioner."

A recess was then declared and counsel held an off-the-record hallway conference with the witness to determine whether he would state he had discussed the case with the victim's brother. He apparently denied any such conversation occurred; and the prosecutor reported back to the judge at the bench: "The answer to the question is no, so I'm going to ask for [an] admonition to the jury by the court stating that there were no grounds for the question." The judge's reaction was extraordinary: "The conduct is clearly improper . . . . Yes, you're entitled to an admonition. I'm wondering whether I need to cite Mr. Jaffe for contempt and pursue contempt action and punish him for the improper conduct." Defense counsel explained the question was asked in good faith and that he had no access to this police witness before trial and had no idea what his answer might be. The judge retorted, "That's why it's in bad faith, because you have no idea what you're doing."

The judge then turned to the jury and stated, "Ladies and gentlemen, the inquiry of counsel was improper, as he had no good faith belief of any contact or communication whatsoever between a sheriff's officer named Fatone and this particular witness, a sheriff's officer from Orange County. [¶] The court has admonished counsel that the inquiry, without a good faith belief that there was some communication, was improper and *unethical* and I've admonished Mr. Jaffe at the bench, and I now admonish him before the jury, that the conduct is improper and he should not have asked the question. [¶] There is, in fact, no contact whatsoever between such deputy, if there be such a deputy, named Fatone and this witness. [¶] You may inquire Mr. Jaffe. [¶] Oh, it's almost time for our afternoon break. Oh, I'm sorry Mr. Jaffe, I didn't mean to interrupt your searing examination of the witness." (Italics added.)

We have a number of difficulties with the preceding passage; not the least of which is, counsel was not permitted to obtain Sulka's denial of the suggested conversation under oath or even on the record. ▪ Defense counsel has an absolute right to explore avenues of potential bias with a prosecution witness, particularly a police officer. And he can hardly be required to know the answer to every question in advance; he cannot compel witnesses to submit to pretrial interviews or to tell the truth if they do.

Evidence Code section 780 provides, "Except as otherwise provided by statute, the court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the

truthfulness of his testimony at the hearing, including but not limited to any of the following:

"......................................................

"(f) The existence or nonexistence of a bias, interest, or other motive." As one court observed, "It is *always* proper for a party against whom a witness has given damaging testimony to show out of the mouth of the witness himself, *if he can,* or by other sources, if necessary, that such witness has an unusual interest in the outcome of the case . . . ." (*People* v. *Sacramento Butchers' Assn.* (1910) 12 Cal.App. 471, 494 [109 P. 712], italics added.)

We recognize leading authorities on the subject of cross-examination suggest counsel should never ask a question without knowing the answer in advance (Friedman, Essentials of Cross-Examination (Cont.Ed.Bar 1968) § 10.2, p. 113); but this is a tactical restriction, not a legal one by any means. We are also aware there are certain subjects of such an inflammatory nature that it can be misconduct to ask about them without a factual basis. For example, it is improper to ask whether a witness has suffered a prior felony conviction without adequate reason to believe that is the case. (*People* v. *Perez* (1962) 58 Cal.2d 229, 238-239 [23 Cal.Rptr. 569, 373 P.2d 617, 3 A.L.R.3d 946].)

Here, however, if it yielded nothing, i.e., a simple "no," the question proposed by defense counsel would hardly have been prejudicial to the prosecution—unless one adopts the nonsensical suggestion that a crime victim's credibility is harmed by having a relative in law enforcement. The possibility the two deputies from different departments may have conversed concerning the incident, while perhaps remote, is not completely without foundation. The chase did lead from Orange County to Los Angeles County, and the record shows Sandra believed Jerry's brother had assisted him against her in the past.

Counsel in the defense of criminal cases is not held to a standard of miraculous prescience. He *is,* however, required to explore reasonable avenues of defense or run the risk of "a vicious *apres* trial attack on his professional competency . . . ." (*People* v. *Spring* (1984) 153 Cal.App.3d 1199, 1208, fn. 5.) The subject was certainly well within ethical parameters; nothing in the rules of professional conduct even remotely implies to the contrary. (Bus. & Prof. Code, foll. § 6076.)

 In sum, we find the trial judge's treatment of defense counsel during the examination of Deputy Sulka indefensible. It is completely improper for

a judge to advise the jury of negative personal views concerning the competence, honesty, or ethics of the attorneys in a trial. (See, in general, Cal. Criminal Law Practice Series, Prosecutorial and Judicial Misconduct (Cont.Ed.Bar 1979) § 2.5, pp. 76-78.) Even if the judge's ruling on the prosecutor's objection could be defended, that would not justify reprimanding defense counsel before the jury. When the court embarks on a personal attack on an attorney, it is not the lawyer who pays the price, but the client. And the error, where prejudicial, is reversible.

For example, in *People* v. *Black* (1957) 150 Cal.App.2d 494 [310 P.2d 472], the Court of Appeal held, "Though counsel's line of inquiry was objectionable [citations], and the ruling essentially proper, the judge's remarks were inescapably prejudicial. Counsel was accused of unfairness and told that he would not be permitted 'by intimidation to beat this girl down unless it is proper.' . . . The judge himself raised the matter of misconduct on his part and concluded with the threat of dire consequences if his admonitions were not heeded. The whole incident was precipitated by the judge, was highly improper and inevitably prejudicial to defendant because of obvious bias in favor of the complaining witness and disapproval of the halting efforts of defendant's counsel." (*Id.,* at p. 499.) The judgment was reversed.

Another classic exposition of judicial misconduct is found in *People* v. *Mahoney, supra,* 201 Cal. 618. There, the Supreme Court castigated the trial court for characterizing counsel's questions and objections as "silly," "idiotic," "trivial," and lacking a "scintilla of sense"—and reversed. (See also *People* v. *Zammora* (1944) 66 Cal.App.2d 166 [310 P.2d 472] and *People* v. *Dickman* (1956) 143 Cal.App.2d Supp. 833, 836 [299 P.2d 30].)

■ Although denial of the right to counsel is reversible per se (*People* v. *Bigelow* (1984) 37 Cal.3d 731, 746 [209 P.2d 328, 691 P.2d 994]), the damage occasioned by interference with Sixth Amendment rights may be, in certain circumstances, reasonably assessed and found to be harmless. (*People* v. *Fulton* (1984) 155 Cal.App.3d 91, 100-101 [201 Cal.Rptr. 879].) In those cases where judicial mistreatment of counsel has been determined not to be prejudicial, "[i]t appears from the decisions . . . that appellate courts are unlikely to view one or two disparaging remarks as grounds for reversal. A pattern of judicial hostility seems to be required." (Cal. Criminal Law Practice Series, *supra,* § 2.5, at p. 78; see, e.g., *People* v. *Jackson, supra,* 44 Cal.2d 511, 521; *People* v. *O'Donnell* (1938) 11 Cal.2d 666, 671 [81 Cal.Rptr. 939]; *People* v. *Alfaro* (1976) 61 Cal.App.3d 414, 425 [132 Cal.Rptr. 356]; and *People* v. *Ham* (1970) 7 Cal.App.3d 768, 783 [86 Cal.Rptr. 904].)

Unfortunately, the misconduct in this case was not confined to the defense examination of Deputy Sulka. As we shall demonstrate, it permeates the record and defies a finding of no prejudice. The prosecution case was not overwhelming by any standard. The jury had to choose between the naturally suspect testimony of former spouses still at war over an inherited home and child custody and visitation rights. The best corroboration of the prosecution version was Sandra's purchase of the gun and her desperate flight; but these factors were considerably explained by her undoubted paranoia. Also, there was no physical evidence the gun had been fired, and the destination of the flight turned out to be an unusual one for a fleeing felon, a police station.

To illustrate "the pattern of judicial hostility," we set forth below a selection of examples, witness by witness. Parenthetically, it is noteworthy that the prosecutor rarely received such treatment; to the contrary, his frequently frivolous objections were almost as frequently sustained. Not every example amounts to misconduct independently, nor does each necessarily involve an erroneous legal ruling. But together they tend to illustrate the demeaning, patronizing attitude displayed by the judge toward Sandra's attorney before the jury:

*Jerry Fatone* (the victim):

"Q. Now, during the time—did you say that Sandra lived in the house while this matter was being probated?

"The court: Asked and answered. Sustained.

"Mr. Jaffe: I didn't recall the answer, that is why I asked it again.

"The court: You have to stay alert, counsel. Next question.

"Q. At any time did you—strike that. What is the address of that house that was the subject of probate?

"The court: Irrelevant, sustained.

". . . . . . . . . . . . . . . . . . . . . .

"Mr. Jaffe: Mr. Bailiff may I see the—

"The court: What have you got in the box, counsel, bullets?

"Mr. Jaffe: I have nothing in the box. I'm going to ask the court to mark it as Defendant's A for identification.

"The court: It is so marked. Deliver the box to the bailiff please. I've never heard of anybody being shot by a box, but this may be the first time.

". . . . . . . . . . . . . . . . . . . . . . . .

"Q. At the time of the preliminary hearing, did you not state—the question was asked:

'Were you closer than the 10 or 15 feet at the time you closed the door?'

"Answer on line 25: 'No, I was not any closer than that.'

"Mr. Feccia: Excuse me, counsel skipped a couple—

"The court: From that position it's asinine, in any event, if the lady is at the door, and he's trying to close the door, he's closer than 15 feet. I don't know what you're trying to prove.

"Mr. Jaffe: I'm trying to find out what—

"The court: Did you ever try to close a door from 15 feet away?

"Mr. Jaffe: Yes.

"The court: Okay next question. The position is ridiculous.

". . . . . . . . . . . . . . . . . . . . . . . .

"Q. I'd like to invite your attention to [a certain page of] the transcript of the preliminary hearing . . . .

"Mr. Feccia: Object to it, your honor. It's not inconsistent.

"The court: None of these are [*sic*] inconsistent. But go ahead, counsel. Much ado about minutia.

". . . . . . . . . . . . . . . . . . . . . . . .

"Mr. Feccia: I object to it, it's not inconsistent.

"Mr. Jaffe: That's something that the jury has to determine.

"The court: The jury doesn't have to hear overly consistent material over and over again.

"Mr. Jaffe: If your honor pleases, may I approach the side bar?

"The court: No."

*Richard Paddock* (Orange County Deputy Sheriff, testifying as to the car chase):

"Mr. Jaffe: I can't look at these pictures and listen to the testimony, so it's going to have to be one or the other.

"The court: That sounded like a little old lady's comment. Was that an objection of some kind.

"Mr. Jaffe: He asked me to look at these photographs and then interpose objections where necessary—

"The court: You can't look and listen at the same time?

"Mr. Jaffe: I can't look and listen with my bad eyes and listen with my bad ears.

"The court: Go ahead Mr. Feccia.

". . . . . . . . . . . . . . . . . . . . .

"Q. Did you not say—

"Mr. Feccia: It's irrelevant.

"The court: No, no, no, Mr. Jaffe. The objection is sustained. Improper impeachment. If you want him to refresh his recollection, he may do so.

". . . . . . . . . . . . . . . . . . . . .

"Q. Nowhere in your report—

"Mr. Feccia: It's irrelevant.

"The court: Objection sustained.

"Mr. Jaffe: I didn't ask the question.

"The court: It doesn't make any difference. You're not going to ask that question.

"............

"The witness: Yes, sir, I saw her go back into the vehicle.

"By Mr. Jaffe: Why didn't you put that into the report?

"Mr. Feccia: Objection; irrelevant, improper impeachment.

"Mr. Jaffe: Your honor, I'd like to make an offer of proof.

"The court: Every minute fact is never contained in a report. The police report is hearsay, not relevant.

"Mr. Jaffe: He used that to refresh his recollect [*sic*].

"The court: Sustained. Move on.

"............

"The court: Sustained. Have you concluded your examination, Mr. Jaffe, or are you falling asleep.

"Mr. Jaffe: No, your honor, I can further—I'd like to further examine this witness without incurring your honor's wrath.

"The court: I just want you to move on and ask relevant questions."

*Stephen Butcher* (forensic specialist with the Orange County Sheriff's Department):

"Q. You'll notice in the photograph, to which I made reference, there's a pair of woman's sandals on the seat of the vehicle, driver's side; is that correct?

"A. Yes, sir.

"Q. And that was there at the time you were called and the time you made—not called, the time you made the photograph?

"The court: How could he have gotten a photograph of something that wasn't there Mr. Jaffe?

"Mr. Jaffe: I don't know.

"The court: I don't know either; that's an interesting question.

"Mr. Jaffe: That's why I asked it, respectfully.

"The court: I was wondering why you asked."

*Sandra Fatone:*

"The court: Good morning ladies and gentlemen. Your lordship [defense counsel] is now ready, see, so we can start. You [the prosecutor] may inquire.

". . . . . . . . . . . . . . . . . . . .

"The court [to Mr. Jaffe]: Any reason you can't call her Mrs. Fatone?

"The witness: I don't like that.

"The court: She's no longer a little girl, Mr. Jaffe.

"Mr. Jaffe: I appreciate that.

"The witness: Yes, but I don't like to be called Mrs. Fatone.

"The court: Well, we like you to be called Mrs. Fatone in this court.

"Q. Mrs. Fatone, you're going to have to be called Mrs. Fatone in this court."

". . . . . . . . . . . . . . . . . . . .

"Q. Sandra, I show you People's No. 22.

"The court: Tell you what, Mr. Jaffe, if you call her Sandra again, I'm going to cite you for contempt.

"Mr. Jaffe: It's just habit, your honor.

"The court: Get out of the habit. Adult witnesses are to be referred to by their surnames for a number of reasons, all of which you are aware of."

Thus, the pattern is clear, the prejudice evident. Sandra is entitled to a reversal and retrial: "Trial judges should heed Isabella's admonition in Shakespeare's Measure for Measure, act II, scene 2, when she declares:

'O! it is excellent to have a giant's strength; but it is tyrannous to use it like a giant.'" (*Lewis* v. *Bill Robertson & Sons, Inc.* (1984) 162 Cal.App.3d 650, 657 [208 Cal.Rptr. 699].)

■ Although not raised on appeal, we note also that in the course of the cross-examination of Jerry Fatone and other witnesses, the court consistently and quite improperly required defense counsel to turn over writings used for impeachment to the prosecutor and the witness—and it frequently did so in a way that implied devious tactics on the part of the defense: "We'll take a half hour out of our lives now and let Mr. Feccia see everything that you intend to use. Also the witness is entitled to see those matters so he can refresh his recollection. Maybe we can speed the process up that way."

Since the adoption of the Evidence Code some twenty years ago, the law has been contrary to the procedure imposed by the court (Evid. Code, § 769): "The disclosure of inconsistent written statements that is required under existing law limits the effectiveness of cross-examination by removing the element of surprise. The forewarning gives the dishonest witness the opportunity to reshape his testimony in conformity with the prior statement." (Com. to Evid. Code, § 769.) Under well-established precedent, the order also appears to have violated California's stringent standards concerning prosecutorial discovery. (See, e.g., *People* v. *Collie* (1981) 30 Cal.3d 43 [177 Cal.Rptr. 458, 634 P.2d 534, 23 A.L.R.4th 776], *Allen* v. *Superior Court* (1976) 18 Cal.3d 520 [134 Cal.Rptr. 774, 557 P.2d 65], *Reynolds* v. *Superior Court* (1974) 12 Cal.3d 834 [117 Cal.Rptr. 437, 528 P.2d 45], and *Prudhomme* v. *Superior Court* (1970) 2 Cal.3d 320 [85 Cal.Rptr. 129, 466 P.2d 673].)

V

In a motion *in limine,* the prosecutor sought to bar the testimony of a retired commissioner of the Los Angeles County Superior Court who had presided over three hearings at the height of the Fatone domestic warfare. According to the defense offer of proof, "he came to an opinion and conclusion concerning the character of Mr. Fatone. I plan to call him to testify concerning that character." He added, "For truth and veracity, because he would testify that the documents that he filed in his behalf lacked veracity. He came to that opinion by listening to [Jerry Fatone] testify, and I feel that that testimony would be relevant after Gann [i.e., Proposition 8, Cal. Const., art. I, § 28, subd. (d): 'Except as provided by statute hereafter enacted by two thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding . . .']." Defense counsel somewhat illogically argued the evidence was ad-

missible because section 787 of the Evidence Code, which prohibits the use of specific acts of misconduct to impeach a witness, had been "abolished" by Proposition 8.

The prosecutor seemingly realized opinion and reputation testimony might be admissible, even if specific instances of former perjury were not (apparently forgetting his own offer of Sandra's prevarication in denying previous mental commitments on the gun registration form). He responded the commissioner lacked sufficient foundation to state such an opinion and the evidence was but marginally relevant and would be highly prejudicial. The commissioner was not asked to testify outside the presence of the jury, however, and the judge granted the motion *in limine* without explanation. We will conclude that, absent the testimony of the commissioner on the record, the foundation given by way of the offer of proof was indeed insufficient. But if the commissioner is called again at retrial, the defect may be curable. We consequently address the issue for the guidance of the court.

Defense counsel repeats here the same argument he advanced below. The Attorney General counters Proposition 8 did not repeal Evidence Code section 787 (with little to support that position), but even if it did, the proposed testimony would be "inadmissible opinion, irrelevant, impeachment on a collateral issue, and would necessitate undue consumption of time, create a substantial danger of undue prejudice, confuse the issues, and mislead the jury." This sweeping condemnation of the evidence is supported by but a single appellate citation, a quaint, 87-year-old murder case which examines a completely different subject, the limits of the scope of impeachment of a defendant with his own former testimony in view of the privilege against self-incrimination (*People* v. *Arrighini* (1898) 122 Cal. 121 [54 P. 591]). The case is well beside the point we consider here.

The defense theory also suffers from several defects, however. The first makes it unnecessary for us to face the thorny question of whether Proposition 8 has, among other things, abrogated most of the Evidence Code. (See *In re Lance W.* (1985) 37 Cal.3d 873 [210 Cal.Rptr. 631, 694 P.2d 744].) This incident preceded the passage of Proposition 8 by more than a year-and-a-half; and months before any of the briefs were filed in this case, the Supreme Court decided Proposition 8 is not retroactive. (*People* v. *Smith* (1983) 34 Cal.3d 251, 262 [193 Cal.Rptr. 692, 667 P.2d 149].) A second problem, as we noted earlier, is the continuing failure of the defense to recognize the difference between opinion or reputation evidence and evidence of specific acts of misconduct. If a sufficient foundation can be presented, the former is admissible under Evidence Code section 1100, although section 787 bars the latter.

Professional finders of fact, such as judges, must form opinions as to the truthfulness of testifying parties. These opinions are reflected in judgments of often enormous magnitude to the litigants, who consequently have ample motivation to present themselves in the best possible light. We know of no established rule of law which would preclude a judge, with sufficient foundation, from testifying to an opinion concerning the character or reputation of a prosecution witness in a criminal trial, based on matters previously disclosed in another proceeding. For example, after hearing repeated admissions of perjury, a judge would obviously have grounds for an adverse opinion of the credibility of a witness. Or, having heard numerous upstanding citizens swear a witness has a poor reputation for truthfulness, a judge would also qualify as one capable of testifying to that fact.

Lay persons generally form opinions concerning credibility in two ways: based on what is told to them by the objects of the opinion or on what is told to them by others about that individual. Judges do the same. In our view, the location where the process occurs, on the street or in a courtroom, is of no particular significance. Our research has revealed a dearth of authority on the question, however. (Cf. *State* v. *Kelly* (1973) 131 Vt. 582 [312 A.2d 906, 86 A.L.R.3d 625] [testimony of two judges concerning low opinion of police officer's credibility properly excluded] and *State* v. *Cambron* (1905) 20 S.D. 282 [105 N.W. 241] [not error to allow prosecution to offer opinion of justice of the peace concerning reputation of alleged house of ill-fame based on statements of police officers in the justice court]; see also Annot., Judge as Witness (1978) 86 A.L.R.3d 633, 679-680.)

There is, of course, an obvious danger undue weight might be accorded to the opinion of a judge. As one court held in the context of an insurance bad faith case where the trial judge was called to support the plaintiff's contention his defense was mishandled in a previous proceeding, "We think it prejudicial to one party for a judge to testify as an expert witness on behalf of the other party with respect to matters that took place before him . . . . [¶] We conclude that the trial court erred in permitting the judge to testify as an opinion witness with respect to matters that had come before him in his judicial capacity." (*Merritt* v. *Reserve Ins. Co.* (1973) 34 Cal.App.3d 858, 882-883 [110 Cal.Rptr. 511].)

Still, we know of nothing which precludes the use of such testimony on behalf of a criminal defendant, and a blanket ban might well founder on constitutional shoals. (*Davis* v. *Alaska* (1974) 415 U.S. 308 [39 L.Ed.2d 347, 94 S.Ct. 1105]; *Chambers* v. *Mississippi, supra,* 410 U.S. 284.) Moreover, "[e]xclusion of evidence bearing on the credibility of a prosecution witness where only he and the defendant are percipient witnesses has been held to be prejudicial error. (*People* v. *Mizer* (1956) 195 Cal.App.2d 261

[15 Cal.Rptr. 272].)" (*People* v. *Rowland* (1968) 262 Cal.App.2d 790, 798 [69 Cal.Rptr. 269].) The Evidence Code pointedly bars the testimony of judges concerning "any statement or conduct occurring at [a] prior proceeding" in civil trials under most circumstances (Evid. Code, § 703.5), but just as pointedly fails to mention criminal cases. If the defense is able to lay the appropriate foundation to support the admission of opinion or reputation evidence on retrial, the testimony of the commissioner may be admissible, provided it survives the test applicable to all relevant evidence in this state, i.e., that its probative value outweighs the prejudical effect and causes no undue consumption of time (Evid. Code, § 352).

VI*

· · · · · · · · · · · · · · · · · · · · · ·

Judgment reversed.

Trotter, P. J., and Sonenshine, J., concurred.

---

*See footnote, *ante,* page 1164.